171 Cal.App.4th 251 (2009)
In re DAVID H. McGRAW on Habeas Corpus.
No. F054655.
Court of Appeals of California, Fifth District.
February 19, 2009.
*255 Heather MacKay, under appointment by the Court of Appeal, for Petitioner David H. McGraw.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jessica N. Blonien and Krista L. Pollard, Deputy Attorneys General, for Respondent State of California.

OPINION
GOMES, J.
In 1981, David H. McGraw was convicted after trial by jury of second degree murder with use of a firearm and sentenced to a 17-year-to-life term. In 2007, a panel of the Board of Parole Hearings (Board) found him not suitable for parole. We will reverse the Board's decision and remand for reconsideration by the Board in light of intervening Supreme Court clarification of the law of parole suitability. We will intimate no opinion about whether the Board should find McGraw suitable for parole.

FACTUAL AND PROCEDURAL BACKGROUND
On the afternoon of November 18, 1980, McGraw and his 22-year-old stepson Terry played several games of pool and drank a large quantity of beer at a Kern County bar.[1] In the presence of his wife Patricia, his daughter Tiffany, and his other stepson, Danny, he threatened Terry with a knife during an argument he and Terry had about Danny. McGraw and Terry left the bar and went home.
Time passed, but Terry did not return to the bar, so Patricia called home, but no one answered, so she, Danny, and Tiffany went home to look for him. Danny and Tiffany went inside, ran back outside, and Danny told Patricia he saw blood everywhere. Patricia returned to the bar and talked with a customer who called the police.
Before officers arrived at McGraw's home, his stepdaughter Vicki went inside his home, saw him in the kitchen attempting to clean blood off the floor, and left. Officers who saw McGraw standing outside ordered him three times to walk toward them, but only after the third command did McGraw *256 comply. Observing blood on his clothing and shoes, officers asked him if there was a problem. Replying in the negative, he said he had "been in a fight but the matter had been taken care of."
Shortly afterward, an officer found blood in the driveway, a large pool of blood near a pickup parked in the driveway, and drag marks leading from the rear entrance of the home to the pickup. The officer looked inside the bed of the pickup and saw Terry's body. McGraw was arrested. An autopsy showed Terry had four bullet wounds fired from point-blank range to 18 inches away. The weapon, a .22-caliber semiautomatic pistol, was recovered from McGraw's home.
McGraw told detectives that he and Terry continued to argue after returning home from the bar, that Terry lunged at him with a butcher knife, and that he fired at him with a .22-caliber pistol he grabbed from the kitchen table. He said that Terry fell to the floor but tried to get up and that he remembered shooting him in the head and in the chest. He put the body in the bed of the pickup, covered it with a piece of Sheetrock, and cleaned up the blood from the kitchen.
On September 14, 1981, McGraw was convicted after trial by jury of second degree murder with use of a firearm. (Pen. Code, former §§ 187, 12022.5.)[2] On September 21, 1981, he entered state prison with a 17-year-to-life term. On March 20, 1982, he commenced service of his life term with a minimum eligible parole date of April 21, 1990.

DISCUSSION
Preliminarily, the Attorney General argues that McGraw's petition should be dismissed on the ground that he fails to show good cause for "significant delay in seeking habeas corpus relief." On April 30, 2007, the Board found McGraw not suitable for release on parole. On August 28, 2007, as the Attorney General acknowledges, the Board's decision became final. (Cal. Code Regs., tit. 15, § 2043.) Two and one-half months later, on November 13, 2007, McGraw filed a petition for writ of habeas corpus in the superior court. On January 7, 2008, the superior court denied the petition. Less than a month later, on February 5, 2008, he filed the petition for writ of habeas corpus now before us. The Attorney General fails to persuade us that McGraw's delay in seeking habeas corpus relief was significant. (Cf. In re Clark (1993) 5 Cal.4th 750 [21 Cal.Rptr.2d 509, 855 P.2d 729].)

*257 1. Governing Law

(1) Last year, the companion cases of In re Lawrence (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (Lawrence) and In re Shaputis (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (Shaputis) clarified the law of parole suitability as originally outlined by In re Rosenkrantz (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (Rosenkrantz). (Lawrence, supra, at p. 1205.) "`[T]he governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (... § 3041, subd. (b).) And as set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole.[3] Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' (Rosenkrantz, supra, 29 Cal.4th at p. 654, italics added; see also In re Smith (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655] [`parole is the rule, rather than the exception'].)" (Lawrence, supra, at p. 1204.) Prisoners have a constitutionally protected liberty interest in the parole suitability decisions of the Board. (Id. at pp. 1211-1212, citing Rosenkrantz, supra, 29 Cal.4th at p. 664.)
(2) "Pursuant to statute, the Board `shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date `in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public....' (§ 3041, subd. (a), italics added.) Subdivision (b) of section 3041 provides that a release date must be set `unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' (Italics added; see Rosenkrantz, supra, 29 Cal.4th at p. 654, fn. omitted.)" (Lawrence, supra, 44 Cal.4th at p. 1202.) The "core determination of `public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." (Id. at p. 1205.)
(3) "All relevant, reliable information available to the panel shall be considered in determining suitability for parole." (Cal. Code Regs., tit. 15, *258 § 2281, subd. (b).) "Such information shall include the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Ibid.) The "fundamental consideration in parole decisions is public safety." (Lawrence, supra, 44 Cal.4th at p. 1205.)
(4) The regulations articulate circumstances tending to show unsuitability for parole: "(1) a commitment offense carried out in an `especially heinous, atrocious or cruel manner'; (2) a `[p]revious [r]ecord of [v]iolence'; (3) `a history of unstable or tumultuous relationships with others'; (4) `[s]adistic [s]exual [o]ffenses'; (5) `a lengthy history of severe mental problems related to the offense'; and (6) `[t]he prisoner[']s engage[ment] in serious misconduct in prison or jail.'" (Lawrence, supra, 44 Cal.4th at p. 1202, fn. 7, quoting Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)-(6).) Those circumstances are "general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2281, subd. (c).)
(5) As to whether the commitment offense was carried out in an "especially heinous, atrocious or cruel manner" (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)), the regulations articulate factors for consideration by the Board: "(A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense." (Lawrence, supra, 44 Cal.4th at p. 1202, fn. 7, citing Cal. Code Regs., tit. 15, § 2281, subd. (c)(1)(A)-(E).)
(6) The regulations articulate circumstances tending to show suitability for parole: "(1) the absence of a juvenile record; (2) `reasonably stable relationships with others'; (3) signs of remorse; (4) a crime committed `as the result of significant stress in [the prisoner's] life'; (5) battered woman syndrome; (6) the lack of `any significant history of violent crime'; (7) `[t]he prisoner's present age reduc[ing] the probability of recidivism'; (8) `[t]he prisoner['s having] made realistic plans for release or ha[ving] developed *259 marketable skills that can be put to use upon release'; and (9) the inmate's `[i]nstitutional activities indicat[ing] an enhanced ability to function within the law upon release.'" (Lawrence, supra, 44 Cal.4th at p. 1203, fn. 8, quoting Cal. Code Regs., tit. 15, § 2281, subd. (d)(1)-(9).) Like circumstances tending to show unsuitability for parole, circumstances tending to show suitability for parole are "general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal. Code Regs., tit. 15, § 2281, subd. (d).)
(7) In short, since "a parole release decision authorizes the Board ... to identify and weigh only the factors relevant to predicting `whether the inmate will be able to live in society without committing additional antisocial acts,'" the criteria that the governing regulations identify for consideration by the Board "are designed to guide an assessment of the inmate's threat to society, if released, and hence could not logically relate to anything but the threat currently posed by the inmate." (Lawrence, supra, 44 Cal.4th at pp. 1205-1206, quoting Rosenkrantz, supra, 29 Cal.4th at p. 655 and citing Cal. Code Regs., tit. 15, § 2281, subds. (c), (d).)

2. Board Hearing

After graduating from Redondo Union High School, McGraw served two years in the Army, took two years of business administration courses at College of the Sequoias in Visalia, and commenced work as a self-employed general building contractor. He never used drugs but admitted he "overused and abused" alcohol. He had been active in the prison AA (Alcoholics Anonymous), even serving as chairperson in 2004, but testified that "it's hard to get into," that "there's a limited time because there's so many people," so that "over the years" he chose to "just practice AA on [his] own."
Acknowledging the opinion of McGraw's evaluating psychologist that he no longer had a need to participate in AA to qualify for release to the community, the Board noted the relationship between alcohol and the commitment offense, insisted he needed "long, sustained participation in AA," and criticized him for no longer attending AA. The psychologist reported "no evidence of any mental or emotional problems" and, due to his years of sobriety, no longer listed "alcohol dependence" as a "current diagnostic impression." Despite the availability of alcohol in prison, the psychologist found him to be "totally committed to sobriety."
McGraw's potential for violence, the psychologist opined, is "less than the average citizen in the community." His decades in custody enabled him to learn the "social skills" of "how to resolve potentially explosive situations" arising out of "close contact with hostile" and "antagonistic individuals."
*260 The Board acknowledged that McGraw's prior record "did not include any violence" and that his "institutional behavior" writeupsthree "128s," the last of which was in March of 1987, two "115s," the last of which was in January of 1987, not one of which involved aggression, force, threats, violence, or weaponsall occurred 20 years or more before the hearing. His classification score was "the lowest possible for a lifer inmate."
The Board noted, on the one hand, that McGraw's age (69 at the time of the hearing) might impair his ability to "maintain any type of employment" but, on the other hand, that his "mobility and movement issues" might entitle him to "beyond the routine [Social Security] benefits." The Board complained about the absence from the record of any correspondence from the Social Security Administration. The Board observed he had no juvenile record at all andapart from a fine and probation for an Unemployment Insurance Code violation in 1967 and a conviction for driving under the influence in 1978no adult record, either, other than the commitment offense 27 years before the hearing.
The Board emphasized the "gravity" of McGraw's commitment offense. Noting that he and Terry had been in each other's lives for about a dozen years, the Board lamented the absence of "the special relationship that should've existed" between the two. Commenting on an "indication" in the record that the first shot was to the eye, the Board savaged him for an "especially cruel and callous" and "very dispassionate and calculated" killing and for his "exceptionally callous disregard for human suffering." Even if Terry was armed with a knife, the Board commented, McGraw nonetheless inflicted three contact wounds "after the first shot" at a time when Terry was "down," "attempting to get up," and "obviously ... no longer ... a threat." The Board labeled as "presence of mind" his cleaning the blood from the crime scene afterward.
The Board acknowledged receipt of a letter from McGraw's sister in Texas saying that her daughter, Donna Carbine of Newbury Park, California, had agreed to let him live with her and her family in the guest room of her home as long as necessary until he could arrange his transfer to Texas. "I've got full support at that address," he stated at the hearing, and "the same support in Texas that I have here." The presiding commissioner replied, "What we really need is, we need letters from both of them, signed by Donna Carbine telling that you do have the offer" and "representing that this is truly the case, and indications of who else lives there," and information about whether the house was free of alcohol and weapons.
McGraw testified that he feels great remorse, that he fired his gun to protect himself after Terry came at him with a knife, and that he did not want *261 to or mean to kill him. The Board found he was "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."

3. Conclusions

On April 30, 2007, the Board found McGraw not suitable for release on parole. Over a year later, on August 21, 2008, the Supreme Court clarified the law of parole suitability. (Lawrence, supra, 44 Cal.4th at pp. 1213-1214, quoting Rosenkrantz, supra, 29 Cal.4th at p. 683; cf. Shaputis, supra, 44 Cal.4th at p. 1254.)
(8) As clarified after the hearing, the Board's "core statutory determination" is "whether the inmate poses a current threat to public safety, and the standard of review properly is characterized as whether `some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous." (Lawrence, supra, 44 Cal.4th at p. 1191.) The focus is not on whether some evidence supports the Board's characterization of the facts in the record but rather on whether there is "`some evidence' of the core statutory determination that petitioner remains a current threat to public safety." (Shaputis, supra, 44 Cal.4th at p. 1254.)
(9) As clarified after the hearing, the Board "may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history," but "some evidence will support such reliance only if those facts support the ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety." (Lawrence, supra, 44 Cal.4th at p. 1221.) The inference that "a particularly egregious commitment offense always will provide the requisite modicum of evidence ..." is "inconsistent" with both the Board's statutory mandate to "consider all relevant statutory factors when evaluating an inmate's suitability for parole" and "the inmate's due process liberty interest in parole." (Id. at p. 1191.) Our duty, then, is to inquire "not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board." (Id. at p. 1221.)
(10) Since McGraw's hearing occurred before the Supreme Court's clarification of the governing law in Lawrence and Shaputis, we cannot indulge the normal presumption the Board applied the appropriate standard of parole suitability. (Cf. In re Katrina C. (1988) 201 Cal.App.3d 540, 547-548 [247 Cal.Rptr. 784].) Instead, with no evidence to the contrary in the record, it is more reasonable to assume the Board applied a different and erroneous standard of parole suitability. "Since the `paramount consideration' at a Board hearing, as clarified by Lawrence and Shaputis, is `whether the inmate currently poses a threat to public safety,' and since `the inmate's due process interest in parole mandates a meaningful review of a denial-of-parole decision' (Shaputis, supra, 44 Cal.4th at p. 1254, citing Lawrence, supra, 44 Cal.4th at p. 1191), and since on the record before us we cannot conclude the error was harmless, we will reverse the Board's decision and will remand the matter to the Board for reconsideration in light of Lawrence and Shaputis within 60 days of the finality of this decision." *262 Since on the record before us we cannot conclude the error was harmless, we will reverse the Board's decision and will remand the matter to the Board for reconsideration in light of Lawrence and Shaputis within 60 days of the finality of this decision. We intimate no opinion about whether the Board should find McGraw suitable for parole.

DISPOSITION
The Board's decision is reversed. The matter is remanded to the Board for reconsideration in light of Lawrence and Shaputis within 60 days of the finality of this decision.
Cornell, Acting P. J., and Hill, J., concurred.
NOTES
[1] The facts are from a correctional counselor's report the Board incorporated into the record of the hearing. For brevity and clarity, references to McGraw's relatives will be by first names. No disrespect is intended.
[2] Later statutory references are to the Penal Code.
[3] The governing statute and regulations for parole suitability decisions for a prisoner who, like McGraw, is serving a sentence for a murder committed on or after November 8, 1978, are, respectively, section 3041 and California Code of Regulations, title 15, sections 2280 et seq. and 2400 et seq. (Cf. Lawrence, supra, 44 Cal.4th at pp. 1201-1202 & fn. 5.)