[No. H032680. Sixth Dist. Apr. 17, 2009.]

In re ARTHUR SAM CRISCIONE on Habeas Corpus.

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Denise A. Yates, Deputy Attorneys General, for Appellant State of California.

Barbara B. Fargo, under appointment by the Court of Appeal, for Respondent Arthur Sam Criscione.

## OPINION

**PREMO, J.**—Petitioner Arthur Sam Criscione was convicted in 1979 of the second degree murder of his girlfriend. He was sentenced to 15 years to life. Following a 13th subsequent parole consideration hearing in 2007, a panel representing the Board of Parole Hearings (Board) again found Criscione unsuitable for parole. Criscione petitioned the superior court for a writ of habeas corpus. The superior court granted the writ and remanded the matter to the Board. Respondent J. Hartley, acting warden at Avenal State Prison (Warden) appeals from that order.[1]

## I. *Introduction*

Judicial review of decisions by the Board or the Governor to deny parole to inmates serving indeterminate life terms is governed by the highly deferential "some evidence" standard of review. (*In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) Until recently, appellate courts have struggled to apply this standard but *In re Lawrence* (2008) 44 Cal.4th 1181, 1205 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*), and the companion case, *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), have now clarified that a decision to deny parole comports with due process only if there is a rational nexus between the relevant statutory factors as found by the Board or the Governor and the determination that the inmate would present a current danger to the public if released. (*Lawrence, supra,* at p. 1210.) Since *Lawrence* was not decided until after the proceedings from which this appeal is taken, and since our independent review of the record suggests that the Board did not adhere to the evidentiary standard *Lawrence* described, we shall remand the matter to the Board for rehearing in light of this clarifying law. We shall accompany the remand order with directions pertaining to

---

[1] Even though the habeas corpus petition concerns the action of the Board, the respondent is the warden of the prison where the inmate is incarcerated. (Pen. Code, § 1477.)

certain of the Board's findings, which, as a matter of law, do not support a conclusion that Criscione is currently dangerous. In so doing, we express no opinion on the ultimate issue, which is Criscione's suitability for parole. (See *In re McGraw* (2009) 171 Cal.App.4th 251 [89 Cal.Rptr.3d 694].)

## II. Factual and Procedural Background

### A. The 2007 Parole Hearing[2]

#### 1. The Commitment Offense

In describing the facts of the commitment offense, the Board read from the published decision in Criscione's direct appeal, *People v. Criscione* (1981) 125 Cal.App.3d 275, 280 [177 Cal.Rptr. 899]: "It is undisputed that appellant [Criscione] killed his girlfriend, Dorothy Quintanar, on the night of February 27, 1979. At about midnight he arrived at the home of his son, Ricky, age 21, and told him he had killed Dorothy. The two men then drove to the home of appellant's ex-wife (Ricky's mother), but she refused to see him. They then stopped at the police station, where defendant asked to speak to certain officers he was acquainted with, but none of them were available. Next, they drove by Mario's, a bar where appellant worked as a bouncer, then stopped at appellant's apartment so that he might see Dorothy 'for the last time.' Appellant returned to the car with a photograph of himself and Dorothy, then broke into sobs. Finally the pair drove back to the police station where appellant told the desk officer that he had killed Dorothy. [¶] Appellant was taken into an interrogation room and given *Miranda* warnings. He admitted that he 'did it,' but declined to say more, although he voluntarily gave the apartment keys to the officer.

"Proceeding to appellant's apartment the police found the body of Dorothy in a water-filled bathtub. The coroner determined the cause of death to be strangulation and drowning. It was noted that the victim had bruises on the palm of her right hand consistent with someone putting pressure on the outside of the hand while she held a blunt object. A steak knife was found in the bathtub."

In preparation for the 2007 parole hearing, Criscione was interviewed and asked about his version of the commitment offense. He declined to discuss the offense and told the interviewer that his version of the crime remained as

---

[2] The Board's parole decisions pertaining to Criscione have been the subject of several proceedings in this court. The three most recent involve parole hearings from 2007 (this appeal), 2006 (*In re Lewis* (2009) 172 Cal.App.4th 13 [91 Cal.Rptr.3d 72]), and 2004 (*In re Criscione* (Apr. 17, 2009, H032426) [nonpub. opn.]), which we have filed concurrently with this opinion.

stated in the report for his initial parole hearing in 1987, which was: "Mr. Criscione readily admits his guilt in the commitment offense. . . . Noting that he turned himself into [*sic*] law enforcement authorities within one hour of the crime, he indicated that the victim, his girlfriend, was hooked on PCP and attempted to stab him, resulting in his killing her. [¶] He continued to assert that he was insane at the time of the commitment offense." There is an indication elsewhere in the record that Criscione has since recanted his claim of insanity.

### 2. *Criminal Record, Previous Record of Violence*

Except for the commitment offense, Criscione had no juvenile or adult criminal record. He has never used drugs or alcohol.

Criscione was married to Doris Cabrera when he was 17. Cabrera was pregnant at the time. Testimony at the trial revealed, "Just before the marriage he gave Doris an overdose of sleeping pills, rushed her to the hospital, then reportedly said that if he couldn't have her, he would kill her. [¶] . . . On numerous occasions he exhibited violence toward his wife, accusing her of infidelity, and on one occasion even tried to strangle her." (*People v. Criscione, supra*, 125 Cal.App.3d at pp. 281–282.) The couple was divorced in 1976.

At the 2007 hearing, Criscione denied having given Cabrera sleeping pills or attempting to kill her. He maintained that the pills had been prescribed for him and that Cabrera, who was his girlfriend at the time, wanted an abortion so she took them herself. When asked whether he beat Cabrera "on many occasions" during their marriage Criscione responded, "Yes, yes. It was— There was physical violence." He also admitted that he had choked her a "couple of times," leaving bruises on her neck.

The murder victim's mother testified at Criscione's trial that the relationship between Criscione and the victim had been tumultuous. The victim "was a PCP addict who often behaved in a bizarre and violent manner—once even stabbing her own brother. Violent arguments between appellant and Dorothy were common: indeed only the week before the killing, appellant and Dorothy had argued wildly, appellant accusing her of infidelity, and to punish her, cutting off her hair. . . . [The victim's mother] told appellant to leave Dorothy alone, warning that some day he was going to end up killing her and spending years in prison. Appellant replied that he knew that was true." (*People v. Criscione, supra*, 125 Cal.App.3d at p. 281.)

### 3. *Social History and Parole Plans*

Criscione was born in 1938, making him 41 years old at the time of the crime and 68 at the time of the 2007 parole hearing. Criscione quit school in

the 10th grade to work in the family's bakery business. At the time of his arrest he listed his occupation as a produce clerk and was a member of the Retail Clerks Union. A "physically formidable person" (*People v. Criscione, supra,* 125 Cal.App.3d at p. 281), Criscione also worked part time as a bouncer at a bar. Criscione has an older brother and sister and three adult children. He has remained in contact with all of his family. His brother and sister live in Southern California and each has offered him a place to live and any other help he might need. Criscione's son in Turlock offered to have his father live with him and to help him with any needs he might have.

If paroled, Criscione planned to live with his brother, who had formerly operated a bakery but has now retired. Criscione would look for part-time work. He had completed both the bakery and dry cleaning vocations while in prison and he believed his brother would be able to help him find work. He would have income of $1,127 per month in Social Security and about $600 per month from his union pension.

### 4. Institutional Behavior and Participation in Self-help Programs

Criscione had a nearly spotless prison record, with no major disciplinary infractions and only two minor infractions from 1981 and 1983. Criscione also had numerous laudatory notations in his file.

During his incarceration, Criscione had briefly participated in AA (Alcoholics Anonymous) but since he had never abused drugs or alcohol he found he could not relate to the program. He did participate in anger management programs, including the nine-week, 930-hour, Conflict Anger Lifelong Management program, which he completed in 2005. In 2006, he completed more than 20 components of the Golden Hills Adult School literacy program and a domestic violence class. His counselor reported that there were limited therapy opportunities at Avenal State Prison where Criscione was incarcerated.

### 5. Insight into Causes of Violent Behavior

When asked what he had learned in the domestic violence class, Criscione said he learned "to have consideration for the other person's feelings" and to be "patient." The presiding commissioner asked Criscione if the class had given him any insight into what triggered him to commit violence against his wife and girlfriend. Criscione responded, "Well, mostly it was selfishness" and he has now learned to be "more considerate." The commissioner pressed the point, asking Criscione whether he had identified and changed that which had prompted the violence. Criscione responded that in the past he had "jumped to conclusions" about things that had not actually happened and

would just "start hollering." When asked how he could go from no prior arrests for violence to strangling a person and putting her in the bathtub Criscione responded, "I was chased with a knife." The trigger for the violence that led to the crime was, he said, that the victim had "found some phone numbers . . . [f]emales' phone numbers and that triggered that."

When asked about how he felt about the death of the victim today, Criscione stated, "I feel really bad that I don't even—One time they had pictures, I think, and I didn't want to see them. They had pictures." He further explained, that if he dwelled upon the crime "I feel like kind of withdrawn and try to think of something else."

### 6. *Psychological Factors*

Criscione had a history of mental problems beginning when he was 14 years of age. He had been treated with electroconvulsive therapy at Livermore Hospital six times for depression. The treatments continued until he was 38 or 39 years old. He was once partially disabled from work as a consequence of what he described as a nervous breakdown.

The Board reviewed a psychological report dated June 11, 2005, prepared by Dr. Corinne Schroeder. The report stated, "[Criscione's] risk of harm to others is below average for parolee population. His risk of harm to others would increase if he remarries, given his prior attempt to strangle his wife." The report went on to note that Criscione had not taken full advantage of available vocational programs and did not follow the Board's prior directive that he participate in AA/NA (Narcotics Anonymous). Under the heading "Remorse," Dr. Schroeder quoted Criscione as stating, " 'If I dwell on it. . . . The Board said that we don't have to discuss the crime anymore, not since I got my [parole] date on February 13, 2002. I lost it on July 12, 2002 . . . knew it was coming.' "

Dr. Schroeder concluded "Mr. Criscione was not forthcoming during his interview for this report. He did not explain why he expected to lose his [parole] date. His minimal participation did not serve him well. There is no basis on which to base a recommendation or form a conclusion. Regarding his crime, Mr. Criscione needs to be able to say out loud what he did. He cannot claim to have come to terms with his crime unless he can do so in relevant interviews that impact his fate. Perhaps the Board can impress upon him the importance of his cooperation, and reschedule him again for that purpose. Or, the Board can reach their decision without a psychological report."

Criscione insisted that the report was "faulty," that Dr. Schroeder lacked the expertise to comment upon his vocational status, and that she had

improperly expected him to discuss the crime when he was entitled to decline discussing it. He had filed an inmate appeal pertaining to the negative report, which, he said, was pending.

### 7. *The Board's Decision*

The Board concluded that Criscione was not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The presiding commissioner gave the decision, stating, "The offense was carried out in [an] especially cruel and callous manner. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and the motive for the crime was inexplicable in relation to the offense." The decision included a description of the facts of the crime and concluded, as to it, "His actions go well beyond the minimum necessary for a conviction of murder in the second degree." As to his prior record, the Board's decision noted that Criscione had "a self-reported record of domestic violence, which if prosecuted would have been a crime at the time."

Another factor the Board found to weigh against parole was the 2005 psychological report, which was "not supportive of release" in that it raised the concern that his risk of harm to others, although below average for a parolee population, would increase if he remarried.

The Board found that Criscione's parole plans were "marginal." Given the small amount of income he would receive from Social Security and pensions he was "going to have to begin to look at either another vocation or taking advantage of vocations." He had "programmed minimally" while in prison. For future parole hearings, if he was going to rely upon the vocations of dry cleaning or bakery that he had acquired while in prison, he should be able to identify for the Board what jobs would be available to him in the area to which he planned to parole. "Absent that, then offers of employment would be appropriate."

The Board acknowledged that the Santa Clara County District Attorney, who appeared at the hearing, spoke out against granting parole to Criscione.

The decision specified that the Board was "very concerned that after all this time, you still do not seem to have a grasp on what caused the violence against women in general and specifically what led to the incident [*sic*] offense." The Board also found that Criscione's gains, "especially with regard to self-help, [were] recent and need to be demonstrated they can be maintained over an extended period of time."

The Board commended Criscione for his nearly spotless behavior record and his excellence in completing coursework and obtaining his high school

diploma. Nevertheless, the Board found that the "positive aspects of behavior do not outweigh the factors for unsuitability." The Board recommended he remain discipline free and that he participate in self-help doing book reports on his independent reading if nothing else was available. The denial was for one year.

The presiding commissioner concluded: "[Y]ou're right, you don't have to talk about your instant offense to anyone. However, talking about your feelings about the crime itself, the victims in general, that sort of thing I think would probably serve you well."

B. *The Petition for Writ of Habeas Corpus*

Criscione petitioned the superior court for a writ of habeas corpus, arguing that there was no evidence to support the finding that he would pose an unreasonable risk of danger to the public if released. The superior court granted habeas corpus relief by order dated February 19, 2008. In its order, the superior court found that, in light of the time Criscione had already served, he was "beyond all applicable *first degree* matrices." The court commented, "There is absolutely no logic in analyzing an inmate's crime as a second degree conviction when he has already served the requisite sentence for murder in the first degree." The superior court found "nonsensical" the Board's conclusion that the motive for the crime was inexplicable in relation to the offense. The court went on to fault the Board for discounting Criscione's multiple vocations, his promises of residence, and his retirement benefits. The court did not address the Board's concern that Criscione lacked insight into what caused him to be violent with women.

The superior court concluded that the 2007 hearing had been conducted in accordance with due process but that due process violations occurred in the Board's reaching its decision. The court remanded the matter to the Board with instructions that the Board find the suitability factor listed under California Code of Regulations, title 15, section 2402, subdivision (d)(8)[3] (realistic plans for parole) applied and that there was no basis whatsoever for considering the nature of the commitment offense (§ 2402, subd. (c)(1)) as a factor showing unsuitability. The court remanded the matter to the Board to proceed in accordance with due process and gave Criscione the option of submitting the issue on the record of the 2007 hearing.

Warden filed a notice of appeal on February 26, 2008. We granted Warden's petition for writ of supersedeas, staying the order of the superior court pending the outcome of this appeal.

---

[3] Hereafter, all undesignated section references and all further references to regulations are to title 15 of the California Code of Regulations.

### III. *Discussion*

#### A. *The Statutory and Regulatory Framework*

■ Penal Code section 3041, subdivision (b) provides that the Board "shall" set a parole release date "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." Parole considerations applicable to life prisoners convicted of murder are contained in the regulations, which provide that, before setting a parole date, the Board "shall first determine whether the life prisoner is suitable for release on parole." (§ 2402, subd. (a).) "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (*Ibid.*)

■ Under the regulations, in order to determine whether the prisoner is a current public safety risk, the Board must consider all "relevant, reliable information," including "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (§ 2402, subd. (b).)

Section 2402, subdivisions (c) and (d) list specific factors the Board must consider. Circumstances tending to show unsuitability include that the inmate committed the offense in "an especially heinous, atrocious or cruel manner," possesses a previous record of violence, has an unstable social history, has previously sexually assaulted another individual in a sadistic manner, has a lengthy history of severe mental problems related to the offense, and has engaged in serious misconduct while in prison. (§ 2402, subd. (c)(1)–(6).) Circumstances that show suitability are the lack of any history of committing crimes as a juvenile (*id.*, subd. (d)(1)), a stable social history (*id.*, subd. (d)(2)), acts demonstrating that the prisoner "understands the nature and magnitude of the offense" (*id.*, subd. (d)(3)), evidence that the prisoner committed the crime as the result of significant stress in his life (*id.*, subd. (d)(4)), lack of criminal history (*id.*, subd. (d)(6)), the prisoner's age (*id.*, subd. (d)(7)), realistic plans for the future (*id.*, subd. (d)(8)), and

participation in institutional activities that "indicate an enhanced ability to function within the law upon release" (*id.*, subd. (d)(9)).[4]

B. *Contours of the Board's Discretion*

 Notwithstanding the rather detailed statutory and regulatory framework, parole release decisions are essentially discretionary; they "entail the Board's attempt to predict by subjective analysis" the inmate's suitability for release on parole. (*Rosenkrantz, supra*, 29 Cal.4th 616, 655.) Such a prediction requires analysis of individualized factors on a case-by-case basis and the Board's discretion in that regard is " ' "almost unlimited." ' " (*Ibid.*) But as *Lawrence* clarified, the parole release decision authorizes the Board "to identify and weigh *only the factors relevant* to predicting 'whether the inmate will be able to live in society without committing additional antisocial acts.' " (*Lawrence, supra*, 44 Cal.4th at pp. 1205–1206, italics added, quoting *Rosenkrantz, supra*, at p. 655.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra*, at p. 1212.) Relevance to the issue of the inmate's current risk to public safety is the key. Accordingly, in exercising its discretion, the Board "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (*Id.*, at p. 1219.)

C. *Standard of Review of the Board's Decision*

 Judicial review of the Board's decision is very deferential. To support the Board's decision, "[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Nothing in *Lawrence* changed this aspect of judicial review. We do

---

[4] Not pertinent here is section 2402, subdivision (d)(5), which refers to battered woman syndrome.

not, for example, decide that some evidence is inconsequential or that the Board should have credited the inmate's version of the commitment offense. That is reweighing, which is not our role. (See *In re Palermo* (2009) 171 Cal.App.4th 1096, 1118 [90 Cal.Rptr.3d 101] (dis. opn. of Nicholson, J.).)

■ On the other hand, the standard of judicial review of parole decisions "certainly is not toothless." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) "[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights. If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' " (*Id.*, at p. 1211, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 664.) "Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence, supra*, at p. 1212, citing *Rosenkrantz, supra*, at p. 658.) Stated another way, not only must there be some evidence to support the Board's factual findings, there must be some connection between the findings and the conclusion that the inmate is currently dangerous.

D. *Analysis*

1. *Introduction*

■ Where the standard of proof has been long settled, and absent a statement to the contrary, we ordinarily presume on appeal that a trial court applied the appropriate evidentiary standard. (*Ross v. Superior Court* (1977) 19 Cal.3d 899, 914–915 [141 Cal.Rptr. 133, 569 P.2d 727].) We would apply a similar presumption to decisions of the Board but the law pertaining to the parole decision has not been long settled. Until *Lawrence*, some reviewing courts assumed that a parole denial based simply upon evidence that the commitment offense was particularly heinous, atrocious, or cruel (§ 2402, subd. (c)(1)) comported with due process, so long as the Board indicated it considered the other regulatory factors. (*Lawrence, supra*, 44 Cal.4th at pp. 1208–1209.) As *Lawrence* clarified, however, due consideration "requires

more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Id.*, at p. 1210.) In the present case, although the Board recited its conclusion that Criscione would pose an unreasonable risk of danger to society or a threat to public safety if released from prison, the Board did not articulate any nexus between the factors upon which it relied and its ultimate conclusion. Indeed, as to at least two of those factors, we are unable to discern any nexus between the finding and the conclusion that Criscione is currently dangerous.

### 2. The Nature of the Commitment Offense

■ The Board's initial finding was that Criscione's offense was committed in an especially heinous, atrocious, or cruel manner. (§ 2402, subd. (c)(1).) Evidence that would support such a finding includes evidence that the offense was "carried out in a dispassionate and calculated manner," or "in a manner which demonstrates an exceptionally callous disregard for human suffering." (*Id.*, subd. (c)(1)(B), (D).) The evidence in this case was undisputed that Criscione strangled his girlfriend and that she was found drowned in the bathtub. Whether Criscione deliberately placed the unconscious victim in the partially filled tub or simply left her there to drown after strangling her, his action or inaction in this regard might reasonably be considered exceptionally callous. Indeed, we have previously concluded that the nature of Criscione's crime satisfied the unsuitability factor described by section 2402, subdivision (c)(1). (*In re Criscione* (Apr. 22, 2004, H026155) [nonpub. opn.].) That said, the nature of the crime will not "eternally" provide adequate support for a parole denial. (*Lawrence, supra,* 44 Cal.4th at p. 1226.) Particularly where the prisoner has served the suggested base term for his crime, "the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness." (*Id.*, at p. 1211.) Criscione completed the suggested base term for second degree murder long ago. Accordingly, the Board was bound to weigh all other relevant factors bearing upon his rehabilitation and *current* dangerousness.

### 3. Parole Plans

Section 2402, subdivision (d)(8) lists "realistic plans for release" as another factor showing that the inmate is suitable for parole. In this case, Criscione had realistic plans. Three of Criscione's closest relatives had offered him housing and other assistance. He had bakery skills and believed he would be able to find part-time work in that field to augment the small pension and Social Security benefits to which he was entitled. His brother, who had operated a bakery before retiring, was willing to help him. Given Criscione's

age, familial support, and projected retirement benefits, these plans were realistic. Nevertheless, the Board found his plans were not sufficient, suggesting that to be found suitable for parole Criscione had to train for a new vocation or actually find prospective employment.

Even if the Board felt that further preparation would be helpful to Criscione upon release, reference to this factor as one supporting the unsuitability determination was not individualized consideration in that it had no connection to this inmate's potential for dangerousness. The potential for dangerousness in this case, if there is one, is limited to Criscione's potential for violence against women with whom he shares intimate relations. We fail to see how the lack of a job offer or additional vocational training has any bearing upon this concern.

### 4. *Other Factors*

The Board acknowledged that Criscione did not have a juvenile record or a criminal history prior to the murder, but referred to "a self-reported record of domestic violence" that would have been a crime if prosecuted. It is unclear to what evidence this finding refers. Further, the Board did not specify which of the regulatory factors it believed was supported by this evidence. Given the context of the Board's statement, it seems that the Board found the evidence negated a finding under section 2402, subdivision (d)(1), that Criscione had no juvenile record. There is some evidence that, 51 years ago, Criscione may have caused his girlfriend to take an overdose of sleeping pills, which, if he did, would have been a crime if prosecuted. But we are bound to do more than merely acknowledge the existence of the evidence. (*Lawrence, supra*, 44 Cal.4th at p. 1211.) The record does not tell us what actually transpired between Criscione and his girlfriend back in the 1950's. Whatever it was, it happened so long ago—more than half a century ago—that any connection between it and Criscione's current potential for dangerousness is not self-evident. The Board's rote recitation of the fact gives us no insight into how the Board believed the evidence supported the decision to deny parole.

There is also evidence that the Board apparently did not consider. In finding that the 2005 psychological report was not supportive of release, the Board made no mention of the numerous other psychological reports in the record, which, Criscione argues, reflect his improved mental state. We reject what is, in effect, an invitation to weigh the evidence that the Board seems to have ignored. We note, however, that the 2005 report did not make any recommendation pertaining to Criscione's parole and, therefore, we question the Board's reliance upon this single document. Furthermore, the Board does not seem to have taken into account Criscione's age, which was 68 years at

the time of the 2007 parole hearing. At some point, a prisoner's age reduces the probability of recidivism. (§ 2402, subd. (d)(7).) The Board made no mention of this factor. The Board must consider all relevant evidence, including that which relates to postconviction conduct and rehabilitation. (*Lawrence, supra*, 44 Cal.4th at p. 1219.) It follows that the Board was bound to consider the 2005 psychological report in the context of all the other reports and the effect of Criscione's age upon his potential for dangerousness. It is not clear from the record that it did so.

### 5. Conclusion

The Board relied upon other factors that we have not discussed here: evidence that Criscione failed to grasp the cause of his violent conduct (§ 2402, subd. (d)(3)) and evidence that his gains in the area of self-help were too recent to be supportive of release (*id.*, subd. (d)(9)). If there is some evidence to support these factors, we would uphold the denial of parole so long as those factors individually or collectively justify the Board's conclusion. (Cf. *Rosenkrantz, supra*, 29 Cal.4th at pp. 682–683.) But we would do so only if it were clear that the Board would have reached the same conclusion based solely upon the supported factors. In other cases, the appropriate remedy is to direct the Board to reconsider the prisoner's parole suitability "in accordance with the discretion allowed by law." (*In re DeLuna* (2005) 126 Cal.App.4th 585, 598 [24 Cal.Rptr.3d 643].)

■ Here, the Board did not have the benefit of *Lawrence* and *Shaputis* and the Board's decision does not clearly indicate that it considered the nexus between the facts upon which it relied and its conclusion that Criscione would present an unreasonable risk to public safety if released. In these circumstances, we cannot presume that the Board applied the evidentiary standard as clarified by *Lawrence* or that it would have reached the same conclusion had it done so. Accordingly, remand is warranted.

### E. The Remand Order

Warden argues that the superior court's order, which remands the matter to the Board with directions pertaining to its consideration of the evidence, impermissibly controls the Board's discretion. Warden is partly correct.

■ A court order that precludes the Board from relying upon relevant, reliable information curtails the Board's exercise of discretion and exceeds the court's authority. (*In re DeLuna, supra*, 126 Cal.App.4th at p. 599.) Under this standard, the superior court erred in directing the Board to disregard the nature of the commitment offense. A crime that is particularly egregious will always satisfy the unsuitability factor listed at section 2402, subdivision (c)(1). Its relevance to the parole determination as a whole depends upon

its interrelationship with the remainder of the evidence. Accordingly, we cannot preclude the Board from considering this factor altogether.

On the other hand, it is the role of the court to reject findings that are not supported by any evidence. And even where a finding is supported by some evidence, a court may determine that the evidence has no connection to the inmate's potential dangerousness. In such a case, the court must be very careful not to infringe the Board's discretion. Many facts, standing alone, will not "firmly establish" that the inmate is currently dangerous, but, viewed in context with all the other evidence, could lead to that conclusion. (§ 2402, subd. (b).) In some cases, however, the evidence may be so disassociated from the paramount concern that it cannot, as a matter of law, support a decision denying parole. In that situation, it is incumbent upon the court to insure that the Board's decision does not turn upon such evidence. To do otherwise "would leave potentially arbitrary decisions of the Board or the Governor intact." (*Lawrence, supra*, 44 Cal.4th at p. 1211.) Criscione's parole plans exemplify this situation in that they had no bearing whatsoever upon the inquiry into Criscione's risk to public safety. Accordingly, it is appropriate to direct the Board that it may not rely upon this evidence as a basis for denying parole.[5] Beyond this, however, and provided that the Board considers all relevant, reliable evidence and is able to articulate a rational nexus between its findings and a decision to deny parole, the manner in which the factors interrelate and the weight to be given to each are considerations for the Board. (*Rosenkrantz, supra*, 29 Cal.4th 616, 656.)[6]

## IV. *Disposition*

The matter is remanded to the superior court with directions to modify its order granting petitioner Arthur Criscione's petition for habeas corpus. The superior court shall strike all but the first paragraph of its order and insert the following:

"The Board of Parole Hearings is directed to vacate its 2007 parole decision and to hold a new hearing and issue a new decision within 60 days of this order. The Board shall proceed in accordance with due process in light of *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573], taking into account all relevant statutory factors.

"The Board is further directed that:

---

[5] Of course, our conclusion regarding Criscione's parole plans would not necessarily stand if new evidence is introduced at a renewed hearing.

[6] In light of our conclusion, we need not reach Criscione's argument that the lack of some evidence to support the Board's decision denied him his federal right to due process.

"(1) It shall articulate a rational nexus between its factual findings and a conclusion that petitioner is not suitable for parole.

"(2) Petitioner's parole plans, as proffered at the 2007 parole hearing, are realistic and do not support a determination that he would be dangerous if released. Unless there is new evidence pertaining to this factor (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8)) the Board may not rely upon petitioner's parole plans as grounds for denying parole.

"(3) The Board, in its discretion, may consolidate this 2007 parole review matter with the 2004 parole review and conduct a single rehearing." (See *In re Criscione, supra*, H032426, filed concurrently herewith.)

As modified, the order is affirmed.

Rushing, P. J., and Elia, J., concurred.