[No. H033781. Sixth Dist. Dec. 18, 2009.]

In re ARTHUR SAM CRISCIONE on Habeas Corpus.

1448

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Amanda J. Murray, Deputy Attorneys General, for Plaintiff and Appellant James Hartley, Warden, Avenal State Prison.

Barbara B. Fargo, under appointment by the Court of Appeal, for Defendant and Respondent Arthur Sam Criscione.

## OPINION

**PREMO, J.**—Following a 14th subsequent parole consideration hearing in 2008, the Board of Parole Hearings (Board) again found petitioner Arthur Sam Criscione unsuitable for parole. Shortly after the Board made its decision, the California Supreme Court filed *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*), which clarified the law pertaining to parole denials. The superior court granted Criscione's petition for a writ of habeas corpus, concluding that the matter should be remanded to the Board for a new hearing to be conducted in conformance with the standard set by *Lawrence*. Respondent James D. Hartley, acting warden at Avenal State Prison (Warden) appeals from that order.[1] We conclude that the Board's decision meets the *Lawrence* standard. Accordingly, we shall reverse.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Evidence Submitted at the 2008 Parole Hearing*

##### 1. *The Commitment Offense*

Criscione was convicted in 1979 of the second degree murder of his girlfriend, Dorothy Quinitar. He was sentenced to 15 years to life. Criscione declined to discuss the commitment offense at the hearing. Accordingly, the Board relied upon the probation officer's report of the crime and Criscione's

---

[1] Even though the habeas corpus petition concerns the action of the Board, the respondent is the warden of the prison where the inmate is incarcerated. (Pen. Code, § 1477.)

prior statements contained in the record. In pertinent part, the Board recited the following facts from the probation report: "[O]n February 27, 1979, at approximately 1:20 a.m., defendant walked into the San Jose Police Department and reported a homicide . . . . [D]efendant's son Rick Criscione . . . indicated his father had come over to his apartment and told him, 'I just killed Dorothy and put her in the bathtub.' . . . [T]he victim was found fully clothed and lying in approximately eight and a half inches of water in the bathtub. . . . Further interview with the defendant's son revealed that when his father came to his apartment and told him of the homicide, he noted his father's hair was wet, and one pant leg was also wet. . . . Ricky stated his father told him he and the victim had gone out last night, and when they came home, she'd pulled a knife on him. Ricky stated that this was not unusual, in that she had done this type of thing in the past. The defendant related to his son that he had choked the victim and stated, 'I know she is dead.' . . . Ricky Criscione indicated he felt his father stated he hit the victim first, then choked her. . . . An attempt was made to interview the defendant, but he chose to remain silent. He did state words to the effect 'I don't want to say anything more right now. I did it. She's in my apartment. And I don't want to go back there.' The defendant provided the officer with his key ring and then began to tell him the victim was 'a crystal freak.' And that she had been on glue, drugs, and crystal for approximately five years. . . ."

### 2. *Prior Record, Social History, Institutional Behavior, Parole Plans*

Criscione was born in 1938, making him 70 years old in 2008. Criscione completed the 10th grade at San Jose High School, then went to work in his father's bakery. He had also worked as a produce clerk and part time as a bouncer at a bar. Criscione had no juvenile record and no convictions as an adult other than the offense for which he was incarcerated. He had a history of mental problems, having been treated with electroshock therapy on several occasions up until the age of 38 or 39. He did not smoke or drink. He had been married to Doris Cabrera; they had three children together. The marriage had been marked by violence. Criscione had beaten and choked Cabrera, sometimes leaving bruises on her neck. Cabrera was known to have pretended to pass out to make the choking stop. The marriage ended in divorce in 1977.

Criscione had a nearly spotless prison record with no major disciplinary infractions and only two minor infractions, the most recent from 1983.

Criscione also had numerous laudatory notations in his file. He had participated in a long list of self-help programs, most with the Golden Hills Adult School literacy program. Because the commissioners at the 2007 parole hearing suggested book reports, Criscione had completed several of those as well.

If released on parole, Criscione planned to live with his brother in Corona Del Mar, with his son in Turlock, or with his sister in San Clemente. He was eligible for Social Security and a pension from the Retail Clerks union.

### 3. *Psychological Factors*

The Board referred to a psychological report by Garry L. Hitchcock, Ph.D., dated March 17, 2008, noting that the report was "favorable." The Board then read a portion of the report into the record, as follows: "The inmate currently exhibits no psychiatric symptoms, and he appears to be functioning well within the prison setting. Risk assessment estimates suggest that the inmate poses a low likelihood to become involved in a violent offense if released to the free community. This overall risk assessment estimate takes into account the inmate's cultural background, personal, social, and criminal history, institutional programming, community social support, release plans, and current clinical presentation. In addition, there is the caveat that such an assessment is at least partially based on the likelihood of abstinence from any substance abuse. . . .

"The inmate does not currently see himself as a criminal, but rather as someone who wants to be a productive, responsible citizen in the free community. When he is asked to identify his personal strengths, Mr. Criscione replied, 'I'm a very organized person. I keep my word. As far as work, I'm a very reliable and dependent [*sic*] person. I'm loyal to my family.' . . .

"When he was asked how he has changed over the years of incarceration, Mr. Criscione replied, 'My values have changed. A lot of things you take for granted in the free world, values I held before prison seem silly and ridiculous. And the things I took for granted, I found they are the most precious.' . . .

"As previously mentioned, the historical factors that increase the inmate's risk for future violence includes his previous violent behavior at a young age, and his significant history of volatile relationship instability with women. It is

noted in the record, [i.e., POR], that he provided his pregnant girlfriend the drug Nebutol [*sic*] at age 17, and that he planned to kill her. The records further indicate that he subsequently left the home, changed his mind, and then returned home and took her to the hospital. It is further noted that he subsequently denied any intention of killing her, and he had previously stated that this act may have been an attempt to induce an abortion. Although the inmate acknowledged a significant history of poor anger control and domestic violence with women, he declined to discuss in depth any key elements of the incident [*sic*] offense with this examiner."

The 2007 psychological report further reveals that, as to the life crime, Criscione told the examiner that he and Dorothy had been dating for about one year, they "frequently engaged in arguments since she was 'into drugs.'" Criscione reported that, prior to the murder, "he had only physically assaulted the victim (i.e., open-hand slap to face and shoulders) once, during an argument." The report goes on to note that Criscione "stated that he did not want to discuss the instant offense with this examiner. In regards to his declining to discuss the crime, he stated, 'The higher courts said we don't have to discuss the crime with the Board, and I haven't discussed the crime since that ruling.' When he was asked whether or not he had an anger control problem, he stated, 'In the past I did. I don't think it's a problem now.' In regards to the victim in the instant offense, he stated, 'To tell the truth, for over a year I was really down; I was really down, I was sad, mourning, like losing someone. Her mom came to visit me and it was hard because it reminded me of her.'"

The psychologist diagnosed Criscione as suffering from "Personality Disorder, NOS with passive-aggressive personality traits. Although the inmate presents as very personable and stable at this time, he does have a significant history of aggressive behavior focused mainly on intimate partners in his past (i.e., ex-wife, victim). Through his participation in therapy programs and general maturation, these personality traits are less prominent at this time and in this setting, and he has exhibited behavioral stability within an all-male prison setting for many years. Based on his significant history of domestic violence and the nature of personality traits in general, it is the concern of this examiner that these passive-aggressive personality traits may become more prominent when interacting with females in the community, and it is recommended that his behavior be closely monitored when he is released on parole."

### 4. *District Attorney Opposition*

A deputy district attorney from Santa Clara County appeared at the hearing and opposed a finding of suitability, pointing out that the "most troubling

aspect" of Criscione's past record was his action directed toward female partners. Counsel pointed out that in the most recent psychological report, Criscione told the examiner that, prior to the murder, he had assaulted the victim only once, with a "single, open-handed slap." That, however, was inconsistent with the probation report, which stated that Criscione had had a "stormy relationship" with the victim for two years, that he had once tied her up and cut off her hair, then, several days later, beat her up. It was also inconsistent with the report of the victim's mother, who said she had once confronted Criscione, telling him that she believed he would not be satisfied until he killed the victim. Counsel further noted that Criscione repeatedly refused to discuss these issues with the psychologists, that he "has decided that that's an issue that apparently he wants to set aside in his own self and deal with, I guess, on his own terms. I don't think that society can be satisfied with that approach to this particular life crime. The continued minimization and failure to openly and constantly evaluate why that event occurred and what can be done to see that it never happens again, has to be an indicator that Mr. Criscione is not at this point a good bet to reenter society."

### B. *The Board's Decision*

The Board concluded that Criscione was "not yet suitable for parole, and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board had "some very specific concerns." Factors weighing against a finding of suitability included the commitment offense, which the Board found had been "carried out in an especially cruel and callous manner" and that the motive for the crime was "inexplicable." Also, Criscione had a "history of instability, and that was principally the tumultuous relationships that [he] had with women." And finally, the psychological report "in some regards, is inconclusive, in that the risk assessment is limited in its exam of a significant record of female abuse. And unfortunately until some progress can be made, that there continues to be a certain element of unpredictability with respect to your relationships with women. That being said, we're going to ask that an addendum be completed strictly on that issue, and not on anything else, and we've already ordered that that be done. We'd certainly encourage you to cooperate."

Weighing in favor of a finding of suitability were defendant's excellent discipline record during his time in prison, his lack of any prior criminal record or history of committing crimes as a juvenile, his participation in self-help and programming while in prison, and his acceptable parole plans. The Board did not consider Criscione's age of 70 as particularly favoring release, as he "appears to be very healthy. You certainly don't look your age."

The Board concluded that the factors favoring release did not outweigh the unfavorable factors. The Board noted that the psychological report from June of 2005 did not contain a conclusive assessment of Criscione's potential for dangerousness because Criscione had not been "forthcoming" during that examination. "And again, also the comments that we saw in the record with respect to your past wife indicating that there was much violence in the marriage, and that she'd suffered many beatings at your hands, and several times you had choked her to the point that bruises were left on her neck and she would often have to feign unconsciousness to have the activity stop. We certainly recognize these are things that are in the past, but unfortunately, these are things that until there's some resolution, they tend to make you unpredictable. . . . And it's an issue, at least that this Panel has sufficient concerns, that we do not think—well, we obviously could not today make an assessment that it would be reasonable to release you and that you wouldn't be a danger to society, because we just don't know. That being said, we're going to take steps to try to get this issue resolved for the next Panel."

## C. *The Petition for Writ of Habeas Corpus*

Criscione petitioned the superior court for a writ of habeas corpus, arguing that there was no evidence to support the finding that he would pose an unreasonable risk of danger to the public if released. The superior court granted habeas corpus relief by order dated December 29, 2008. The superior court concluded that the Board had not applied the standard required by *Lawrence, supra,* 44 Cal.4th 1181, but instead had rested its denial of parole on the nature of the offense and a history of instability without articulating any nexus between those findings and the finding of present dangerousness. The court found that the failure to do so was error, particularly in light of the several factors that favored release. This appeal followed.[2]

## II. LEGAL FRAMEWORK

### A. *The Statutory and Regulatory Framework*

■ Penal Code section 3041, subdivision (b) provides that the Board "shall" set a parole release date "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity

---

[2] We have previously granted Warden's petition for writ of supersedeas, staying enforcement of the superior court order pending our decision on appeal.

of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual . . . ." Parole considerations applicable to life prisoners convicted of murder are contained in the regulations, which provide that, before setting a parole date, the Board "shall first determine whether the life prisoner is suitable for release on parole." (Cal. Code Regs., tit. 15, § 2402, subd. (a).)[3] "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (§ 2402, subd. (a).)

 Under the regulations, in order to determine whether the prisoner is a current public safety risk, the Board must consider all "relevant, reliable information," including "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (§ 2402, subd. (b).)

 Section 2402, subdivisions (c) and (d) list specific factors the Board must consider. Circumstances tending to show unsuitability include that the inmate committed the offense in "an especially heinous, atrocious or cruel manner," possesses a previous record of violence, has an unstable social history such as a history of tumultuous relations with others, has previously sexually assaulted another individual in a sadistic manner, has a lengthy history of severe mental problems related to the offense, and has engaged in serious misconduct while in prison. (§ 2402, subd. (c)(1)–(6).) Circumstances that show suitability are the lack of any history of committing crimes as a juvenile (*id.*, subd. (d)(1)), a stable social history (*id.*, subd. (d)(2)), acts demonstrating that the prisoner "understands the nature and magnitude of the offense" (*id.*, subd. (d)(3)), evidence that the prisoner committed the crime as the result of significant stress in his life (*id.*, subd. (d)(4)), lack of criminal history (*id.*, subd. (d)(6)), the prisoner's age (*id.*, subd. (d)(7)), realistic plans

---

[3] Hereafter, all undesignated section references and all further references to regulations are to title 15 of the California Code of Regulations.

for the future (*id.,* subd. (d)(8)), and participation in institutional activities that "indicate an enhanced ability to function within the law upon release" (*id.,* subd. (d)(9)).[4]

### B. *The Board's Discretion*

■ Notwithstanding the rather detailed statutory and regulatory framework, parole release decisions are essentially discretionary; they "entail the Board's attempt to predict by subjective analysis" the inmate's suitability for release on parole. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) Such a prediction requires analysis of individualized factors on a case-by-case basis and the Board's discretion in that regard is " ' "almost unlimited." ' " (*Ibid.*) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*Lawrence, supra,* 44 Cal.4th at p. 1212.) Relevance to the issue of the inmate's current risk to public safety is the key. Accordingly, in exercising its discretion, the Board "must consider all relevant statutory factors, including those that relate to postconviction conduct and rehabilitation." (*Id.* at p. 1219.) As *Lawrence* clarified, however, due consideration "requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision—the determination of current dangerousness." (*Id.* at p. 1210.)

### C. *Standard of Review of the Board's Decision*

■ Judicial review of the Board's decision is very deferential. To support the Board's decision, "[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board]. . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (*Rosenkrantz, supra,* 29 Cal.4th at

---

[4] Not pertinent here is section 2402, subdivision (d)(5), which refers to battered woman syndrome.

p. 677.) Nothing in *Lawrence* changed this aspect of judicial review. We do not, for example, decide that some evidence is inconsequential or that the Board should have credited the inmate's version of the commitment offense. That is reweighing, which is not our role. (See *In re Palermo* (2009) 171 Cal.App.4th 1096, 1113 [90 Cal.Rptr.3d 101] (dis. opn. of Nicholson, J.).)

On the other hand, the standard of judicial review of parole decisions "certainly is not toothless." (*Lawrence, supra*, 44 Cal.4th at p. 1210.) "[I]n light of the constitutional liberty interest at stake, judicial review must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights. If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' " (*Id.* at p. 1211, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 664.) "Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." (*Lawrence, supra*, at p. 1212, citing *Rosenkrantz, supra*, at p. 658.) Stated another way, not only must there be some evidence to support the Board's factual findings, there must be some connection between the findings and the conclusion that the inmate is currently dangerous.

In reviewing the order of the trial court, which was based solely upon documentary evidence, we independently review the record. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

### D. *Discussion*

Warden argues that the superior court should have denied the petition because there is some evidence to support the Board's conclusion that Criscione is currently dangerous. We agree.

The Board based its parole denial upon three findings, the heinous nature of the commitment offense (§ 2402, subd. (c)(1)), Criscione's unstable social history and tumultuous relations with women, and the inconclusive nature of the psychological reports. There is some evidence to support these findings.

The evidence was undisputed that Criscione strangled his girlfriend and that she was found drowned in the bathtub. We have previously concluded that the nature of Criscione's crime was especially egregious, as described by section 2402, subdivision (c)(1). (*In re Criscione* (2009) 173 Cal.App.4th 60, 75 [92 Cal.Rptr.3d 258] ["Whether Criscione deliberately placed the unconscious victim in the partially filled tub or simply left her there to drown after strangling her, his action or inaction in this regard might reasonably be considered exceptionally callous."].) Likewise, there is evidence to support the Board's finding that Criscione had an unstable social history. His marriage was marked by violence. At times he choked his wife so hard he left bruises on her neck. His relationship with the victim was equally tumultuous.

It is true, as Criscione maintains, that the Board may not base a parole denial upon the circumstances of the offense, or other immutable facts, unless those facts support the ultimate conclusion that the inmate continues to pose an unreasonable risk of safety if released on parole. (*Lawrence, supra,* 44 Cal.4th at p. 1221.) For example, in *Lawrence,* the Supreme Court found the nature of the commitment offense, while egregious, was not some evidence of the inmate's current dangerousness. The offense occurred under an unusual amount of emotional stress, which according to all psychological evaluations, had arisen from circumstances that were not likely to recur. (*Id.* at pp. 1225–1226.) Further, during her 24 years of incarceration, the inmate had "an exemplary record of conduct." She had "participated in many years of rehabilitative programming specifically tailored to address the circumstances that led to her commission of the crime, including anger management programs as well as extensive psychological counseling, leading to substantial insight on her part into both the behavior that led to the murder and her own responsibility for the crime. Petitioner repeatedly expressed remorse for the crime, and had been adjudged by numerous psychologists and by the Board as not representing any danger to public safety if released from prison." (*Id.* at p. 1226.) Every other regulatory factor favored release. The Supreme Court concluded that "the unchanging factor of the gravity of petitioner's commitment offense had no predictive value regarding her *current* threat to public safety . . . ," and, therefore, provided no support for the conclusion that she was unsuitable for parole. (*Ibid.*)

In contrast to *Lawrence, In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), which was filed concurrently with *Lawrence,* exemplifies the situation where an egregious crime remains probative of current dangerousness. Shaputis was 71 years old. He had been in prison and discipline free for more than 20 years. He had an excellent work record and had participated in numerous institutional programs to enhance his ability to function in the community. Nevertheless, the Supreme Court concluded that the record supported the Governor's finding that Shaputis was unsuitable for parole. (*Id.* at pp. 1245–1246, 1249.) The commitment offense

was not an isolated incident, like that of *Lawrence, supra*, 44 Cal.4th at pages 1224–1226. "Instead, the murder was the culmination of many years of petitioner's violent and brutalizing behavior toward the victim, his children, and his previous wife." (*Shaputis, supra*, at p. 1259.) Shaputis's lack of insight into the reasons for the murder, his history of domestic abuse, and psychological reports documenting his lack of insight "all provide some evidence in support of the Governor's conclusion that petitioner remains dangerous." (*Id.* at p. 1260.)

As in *Shaputis*, the circumstances of Criscione's commitment offense continue to be probative of current dangerousness. The murder was not an isolated incident. In fact, it was the culmination of Criscione's years of abusing his female partners. It is true that there is evidence here, as there was in *Shaputis*, to support many of the suitability factors. The Board acknowledged that Criscione had not engaged in any serious misconduct while in prison, he had no history of committing crimes as a juvenile, and no criminal history. He also had realistic plans for the future and his participation in institutional activities was commendable. The problem was that the most recent psychological report was inconclusive with regard to whether Criscione would revert to his prior behavior if he were to enter into any close relations with women, a situation he had not experienced for 30 years. Given his apparent good health and physical condition, the Board did not believe that his age ruled out the possibility of such relationships.

The Board's concern was whether or not Criscione had been rehabilitated with regard to his predilection to violence toward female partners. The psychological report expressed the same concern. The psychologist noted that Criscione's "passive-aggressive personality traits may become more prominent when interacting with females in the community." The psychologist who examined him in 2005 was unable to reach any conclusion pertaining to the likelihood he would reoffend. On this record, the Board could not conclude that Criscione would not present a safety risk to women in the future. Thus, given the egregious nature of his crime, his history of violence, and the lack of evidence of rehabilitation in this discrete aspect of his behavior, "it was not irrational to conclude that [Criscione's] predilection to harm others had not evaporated *simply* because of the passage of time during his incarceration in a controlled setting that limits the opportunities and advantages of continuing to engage in harmful behavior." (*In re Ross* (2009) 170 Cal.App.4th 1490, 1508 [88 Cal.Rptr.3d 873].)

That said, the Board did not explicitly describe the connection between its findings and its concern that Criscione is currently dangerous. As we have explained, due process requires that the Board's conclusion be based upon that connection. (*Lawrence, supra*, 44 Cal.4th at p. 1210.) Accordingly, the

superior court issued the writ in this case, finding that, because the Board had not explicitly articulated a rational nexus between its findings and its conclusion that Criscione was currently dangerous, the matter had to be remanded for reconsideration in light of *Lawrence*. Citing this court's decision in *In re Lazor* (2009) 172 Cal.App.4th 1185 [92 Cal.Rptr.3d 36], Criscione argues that, under these circumstances, remand is required. In *Lazor*, this court determined that the Board's decision denying parole had relied solely upon immutable factors and did not expressly rely upon the petitioner's lack of insight or ability to conform his behavior to the law upon release. Further, the Board's decision "failed to relate the identified immutable factors to circumstances that would make them probative of petitioner's current dangerousness." (*Id.* at p. 1203.) Accordingly, it was necessary to remand the matter to the Board for reconsideration under *Lawrence* and *Shaputis*.

In two appeals from previous parole denials in Criscione's case, we agreed that remand was required because the Board had failed to describe any connection between its findings and its ultimate conclusion. In both cases, the Board's decision did not clearly indicate that it had considered the relationship between the factors outlined in its decision and its conclusion that Criscione would present an unreasonable risk to public safety if released. (*In re Criscione* (Apr. 17, 2009, H032426) [nonpub. opn.]; *In re Criscione, supra*, 173 Cal.App.4th at p. 77.) Furthermore, in both prior cases, we had excluded some of the factors upon which the Board had relied for lack of evidence or lack of relevance and, therefore, could not determine whether the Board would have reached the same conclusion solely upon the factors that remained. (*In re Criscione, supra*, at p. 77.) Accordingly, the appropriate remedy was to remand with directions to the Board to reconsider the prisoner's parole suitability "in accordance with the discretion allowed by law." (*In re DeLuna* (2005) 126 Cal.App.4th 585, 598 [24 Cal.Rptr.3d 643].)

■ This case is different. We have not rejected any of the Board's factual findings. And the Board relied on more than just the immutable factors relating to the crime and Criscione's history of violence. The pivotal concern was the 2007 psychological report, which, although finding that Criscione was a low risk to public safety in general, was limited in its assessment of his potential for violence against women with whom he became intimate. Although the Board did not specifically state that there was a "rational nexus" between that report and the ultimate conclusion, we are not required to remand due solely to the absence of some pro forma recitation on the record. To the contrary, *Lawrence* called, instead, for reasoning. (*Lawrence, supra*, 44 Cal.4th at p. 1210.) The Board's explanation contains that reasoning: The Board was concerned about Criscione's potential for violence against women. That concern was not allayed by the psychological reports. Thus, the Board could not conclude "that you wouldn't be a danger to society, because we just don't know."

## III. Disposition

The order of the superior court is reversed. The matter is remanded to the superior court with instructions to enter a new order, denying the petition for writ of habeas corpus.

Rushing, P. J., and Elia, J., concurred.