Filed 2/18/21  In re Bascomb CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re GERALDO CROLL BASCOMB II,<br><br>On Habeas Corpus. | E075221<br><br>(Super.Ct.Nos. FWV028738 & WHCJS2000195)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus.  Gregory S. Tavill, Judge.  Petition granted.

Dennis C. Cusick for Petitioner.

Xavier Becerra, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Amanda J. Murray and Rachael A. Campbell, Deputy Attorneys General, for Respondent.

The Board of Parole Hearings found petitioner Geraldo Croll Bascomb II suitable for parole, but the Board's finding was reversed by the Governor.  Having reviewed the Governor's statement of reasons for the reversal, we find it not supported by the evidence.  It is based on a misreading of one sentence of Bascomb's psychological report, and it finds that he has no clear plans for his return to the community based on a report

1

that preceded his submission to the Board of a detailed plan. Following precedent as to the remedy, we return the matter to the Board to reinstate Bascomb's suitability finding absent new evidence.

## I. FACTS

In 2000, at age 21, Bascomb joined another individual in an armed robbery of a marijuana dealer at the dealer's apartment. While Bascomb ransacked the apartment in search of drugs and valuables, his partner went into the dealer's bedroom, and, after a struggle, shot and killed the dealer. Bascomb was convicted of first-degree felony murder and assault with a deadly weapon. He received a sentence of 25 years to life for the murder, and a consecutive term of two years for the assault.

On December 24, 2018, former Governor Edmund G. Brown, Jr., commuted Bascomb's sentence to 15 years to life, citing his exemplary conduct and rehabilitation in prison. This made Bascomb immediately eligible for a parole hearing, and one occurred the next year after Bascomb had served 16 years in custody.

Prior to the hearing, Bascomb underwent a comprehensive risk assessment by a psychologist, who completed a lengthy report dated April 16, 2019. Bascomb thereafter provided documents to the Board that included a plan for his release and letters from rehabilitation centers at which he had obtained bed space. On August 15, 2019, at the end of a hearing at which he testified, a panel of the Board found him suitable for parole.

The Board relied on the fact that Bascomb was only 21 when he committed the offense and had been incarcerated for 16 years. As he had grown older, the Board found,

2

"he has shown growth and maturity while in prison." He had avoided violence, joining a gang, and using or selling drugs in prison. He had shown rehabilitation because he participated in programming before "he had really any hope of getting his sentence commuted." He had a "stable social history" in prison, "numerous laudatory" reports from his supervisors, and got along with and assisted others. He had "shown remorse, accepted full responsibility for his criminal actions." In the Board's view, he was "no longer susceptible to peer pressure" as he had been at the time of his offense. The Board listed nine rehabilitative prison programs in which he had participated and noted that he was a "facilitator" for the alternatives to violence program. He had "made realistic plans for release" and "developed marketable skills." He had "strong family support" and a "very solid" support network which the Board found "very compelling" in mitigating his risk of reoffending.

However, on January 9, 2020, Governor Gavin Newsom reversed the parole grant pursuant to his authority under Penal Code section 3041.2 and California Constitution Article V, section 8(b). The Governor relied on two factors. First, the Governor found that Bascomb "continues to minimize his role" in the crime. Secondly, the Governor relied on the evaluating psychologist's report that found Bascomb with personality disorders that he needs to "meaningfully work[]" on addressing, and it quoted the report in finding that he had "'no clear plans'" for addressing his substance abuse upon his parole. The trial court denied Bascomb's petition for a writ of habeas corpus challenging the Governor's decision. Bascomb then filed a habeas petition with this court.

3

## II. DISCUSSION

Under Penal Code section 3041, subdivision (b), the Board "shall grant parole" to an eligible inmate unless it determines that "consideration of the public safety" requires continued incarceration of the individual. Regulations require the Board to consider "[a]ll relevant, reliable information," including a non-exclusive list of factors that bear on suitability or unsuitability for parole. (Cal. Code Regs., tit. 15, § 2402, subds. (b)-(d).) The "core statutory determination" is "whether the inmate poses a current threat to public safety." *(In re Lawrence* (2008) 44 Cal.4th 1181, 1191 (*Lawrence*).) The Legislature "explicitly recognized that the inmate's threat to public safety could be minimized over time by changes in attitude, acceptance of responsibility, and a commitment to living within the strictures of the law." (*Id*. at p. 1219.)

The Governor has constitutional authority to review the Board's parole decisions as to inmates convicted of murder. (Cal. Const., art. V, § 8(b).) The Governor may affirm, modify, or reverse the Board's decision "on the basis of the same factors which the parole authority is required to consider." (*Ibid*.) The Governor has discretion to weigh and balance the appropriate factors in determining whether a defendant poses an unreasonable risk to public safety. (*Lawrence*, *supra*, 44 Cal.4th at p. 1204.) If the Governor reverses or modifies a Board decision, the Governor must "send a written statement to the inmate specifying the reasons for his or her decision." (Pen. Code, § 3041.2, subd. (b).)

Our review of the Governor's parole decision is highly deferential and is limited to determining whether there is "some evidence" in the record that supports the Governor's decision. (*Lawrence*, *supra*, 44 Cal.4th at p. 1204.) The review is for whether there is some evidence "that an inmate poses a current threat to public safety, rather than merely some evidence of the existence of a statutory unsuitability factor." (*In re Shaputis* (2008) 44 Cal.4th 1241, 1254.) Despite that we look only for some evidence, we nevertheless are required to determine whether a parole determination has some "'basis in fact,'" because in the absence of at least a "'"modicum"'" of evidence, a parole determination is too arbitrary to countenance. (*Lawrence*, 44 Cal.4th at pp. 1204-1205.) While exceedingly deferential to the Governor, our review must not be merely procedural in determining whether the Governor has facially articulated permissible factors, but "must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights." (*Id*. at p. 1211.)

This is an unusual case where we cannot find the Governor's decision supported by some evidence. The Governor's reasoning relies on two factors, and we conclude that neither is supported by evidence.

A. *Minimizing Role in the Crime*

First, the Governor asserted that Bascomb "continues to minimize his role in this crime." This conclusion relies on a mistaken interpretation of a single sentence from Bascomb's 2019 assessment. Out of context, that sentence could seem to show that Bascomb was minimizing his role. In context, that sentence can only be read as Bascomb

5

criticizing himself for committing the crime despite an upbringing that should not have led him to do so.  It cannot rightfully be read as Bascomb minimizing his role.

The sentence that the Governor quotes is "'I've never fired a gun in my life and I still end up in prison behind [the victim's] murder!'"  Taken in isolation, that statement could appear to be Bascomb blaming the legal system for his crime.  But the context shows otherwise.  That sentence was part of a colloquy in a transcript, and, in the sentence that followed that one, Bascomb stated that he had become a "bully . . . preying on the weak," the beginning of an explanation of blaming *himself* for turning into a criminal despite not being raised as one:

"(Q.  You shot the victim?)  [¶]

"No, ma'am.  I never left the living room.  I was in the kitchen.  [¶]

"(Q.  Blue shot him?)  [¶]

"Yes, during the struggle and I told the investigator.  I've never fired a gun in my life and I still end up in prison behind James' murder!  [¶]

"(Q.  Why do you think you did this?)  [¶]

"I had become what I hated.  I had become a bully, like someone preying on the weak.  And, I didn't like it.  Most of my childhood fights was protecting myself from people like that."

Bascomb then described the process where he believed he had become "a monster" through anger at his parents and rebellion against his upbringing.  He expressly took blame for the robbery, explaining that he thought he could "get away with robbing"

6

the victim and picked him as "the easiest to rob" of drug dealers because other dealers brandished weapons and had a reputation for violence.

After quoting the colloquy, the psychologist concluded "Mr. Bascomb admits responsibility for the death of the victim, noting it was his suggestion to rob him." The psychologist personally interviewed Bascomb, observing him first-hand, and did not see Bascomb minimizing his role. Given the context and the viewpoint of the psychologist who was present, a later reader cannot properly construe the sentence of the colloquy that the Governor relies upon as providing evidence that Bascomb is minimizing his role in the crime.

This is even more clear based on evidence outside of the psychological assessment. When Governor Brown commuted Bascomb's sentence in 2018, the commutation stated: "During an interview with a Board of Parole Hearings investigator, Mr. Bascomb took full responsibility for his crime, [and] expressed sincere remorse . . . ." Bascomb wrote a letter to the victim's family, abjectly accepting responsibility and apologizing. At his parole hearing, Bascomb testified and admitted that he came up with the idea for the robbery. He took responsibility for the devastation he caused the family. He answered questions in detail about how he planned the robbery and what happened. In their ruling, the parole commissioners found that Bascomb "has shown remorse, accepted full responsibility for his criminal actions."

7

The People here do not support the Governor's decision based on the sentence the Governor quoted. Rather, the People argue that Bascomb minimized his role because at his parole hearing he purportedly downplayed his role by "repeatedly insisting he only intended to rob [the victim] because he perceived [the victim] to be an easy target." In stating this, Bascomb was not downplaying his role. In the portion of the hearing that the People cite, Bascomb stated, among other things: "I come up with the idea to rob [the victim]"; "I was a coldhearted individual"; "I wanted more. I wanted to step up my prestige in the drug game. I wanted more money, I wanted more drugs." He also admitted: "I took my gun for force or fear or if anything got out of line or crazy, then I would be able to shoot somebody." It was not minimizing his role in a felony murder for Bascomb to state that he *thought*, wrongly, that he and his cohort would be able to rob the victim without using violence. Notably, when the People's briefing describes Bascomb's personal role in the offenses, it relies significantly on Bascomb's own testimony at the hearing and other places in the record where Bascomb himself provided the relevant facts.[1]

There is no evidence supporting the Governor's finding that Bascomb minimized his role in the crime. Arguably, this alone requires vacating the Governor's decision, where the Governor's decision did not make clear that he would have reached the same

---

[1] The People also rely on Bascomb's failure to cooperate by providing information about his cohort. Neither the Board nor the Governor disputed Bascomb's position that he had no more information about his cohort to offer, and it is not our role to create such a finding to support denial of parole.

8

conclusion in the absence of the factor. (*In re Capistran* (2003) 107 Cal.App.4th 1299, 1306 [where a Governor's decision purports to rely on facts "that are not supported by some evidence, the decision cannot be sustained on the ground that the other aspects of the Governor's decision are supported by some evidence"].) In any event, as described in the following section, the Governor's second factor is not supported by evidence connected to Bascomb's current dangerousness.

B. *Managing Personality Disorders and Substance Abuse*

The second factor the Governor relied on was Bascomb's supposed lack of work or plans to manage the risk from his personality disorders and his history of substance abuse and alcohol. The Governor tied the current problems from these factors exclusively to the findings of the psychologist who performed Bascomb's assessment and did not mention Bascomb's later documentary and oral presentation in connection with his Board hearing.

In the assessment, the psychologist stated that Bascomb met criteria for antisocial personality disorder and narcissistic personality disorder; as far as the record reveals, this is the first occasion where Bascomb had such a diagnosis. The psychologist also noted moderate or mild drug use from before his incarceration, that is, more than 16 years earlier, albeit recognizing that Bascomb had participated in group treatment programs while in custody. The Governor's conclusions as to current danger were based on the implications of these psychological findings. Noting the psychologist's diagnosis of personality disorders, the Governor concluded that until Bascomb "meaningfully works"

9

on addressing his personality traits he remains a recidivism risk. Noting Bascomb's history of substance abuse and alcohol, the Governor relied on the psychologist's statement that Bascomb had "'no clear plans for how to manage this factor upon parole to the community.'"

The psychological assessment, however, came before Bascomb fashioned his parole plans. As the psychologist noted in the report, Bascomb had then "only recently learned his sentence had been commuted and [he] was eligible for parole consideration a decade before he expected, [so] understandably the parole plans Mr. Bascomb presented *today* are in the very early stages." In the months following the evaluation, Bascomb created plans for dealing with his personality and substance issues.

First, Bascomb obtained a bed for himself at two different rehabilitation programs, one called the Partnership for Re-Entry Program and one run by the Salvation Army. These programs involved an array of testing and services which could help address any personality and drug issues he may face. Secondly, Bascomb handwrote a six page relapse prevention plan. In the document, he admitted his problems, explained what he had done to rehabilitate in custody, and listed things he would do and not do after release from custody, including items that relate to his personality and historical drug problems. Thirdly, at his parole hearing, he explained his approach. He planned for his wife to be his "accountability partner" for substance abuse, and he also had a mentor. His wife wrote a letter explaining her role. Bascomb explained that he had researched his personality disorders on the internet and in an encyclopedia of psychology, and had

listened to the doctor tell him that managing his personality would be the key to his success.

Having heard Bascomb's documentary and hearing evidence, the parole commissioners found that Bascomb had "made realistic plans for release." They found his showing "very compelling in terms of [his] success on parole."

The "core determination" for both the Board and the Governor is "an assessment of an inmate's *current* dangerousness." (*Lawrence*, *supra*, 44 Cal.4th at p. 1205.) In determining that Bascomb was suitable for parole, the Board referred to specific parts of Bascomb's plans and concluded that they were satisfactory. A contrary conclusion from the Governor, "absent articulation of a rational nexus between [the] facts and current dangerousness, fails to provide the required 'modicum of evidence' of unsuitability." (*Id.* at p. 1227; *In re Criscione* (2009) 180 Cal.App.4th 1446, 1458 ["there must be some connection between the findings and the conclusion that the inmate is currently dangerous"].) The Governor articulated findings based exclusively on the psychological assessment that occurred before Bascomb had developed and presented his plans for release that included dealing with his personality and substance concerns. Because the assessment preceded those plans, it alone does not have a rational nexus to a finding of current dangerousness due to Bascomb's lack of efforts or unsatisfactory plans.

Beyond simply failing to refer to Bascomb's plans, the Governor found that Bascomb had "no clear plans" for release. That finding is supported by no evidence. Bascomb in fact offered detailed plans for release, drafted in the months after the psychological assessment and presented at his Board hearing. Findings about current dangerousness—at least as to danger from his personality or substance disorders mentioned in the assessment—cannot be properly made without considering those detailed plans. As the assessment appears to have newly diagnosed personality disorders, Bascomb had not even yet had any opportunity to articulate a way he would address those. The Governor's articulated findings affirmatively indicate that he did not base his conclusion on a consideration of Bascomb's plans presented to the Board. We cannot find that the Governor's articulated findings as to current dangerousness from Bascomb's personality and drug proclivities are based on some evidence, because they were not based on the plans Bascomb offered and on which the Board relied.

We are cognizant of the People's position here that we should look beyond the Governor's articulated findings, as the Governor's statement that he considered the evidence in the record should be enough to demonstrate that he has considered the defendant's individual situation and made a determination to which deference is required based even on evidence not cited. That argument might succeed in some situations, as our review is so deferential. However, the Governor's written statement in this case— which erroneously found that Bascomb had no clear plans for release and linked the findings at issue exclusively to the psychological assessment that preceded his plans—

12

indicates that Bascomb's detailed plans for release were not part of the evidence underlying the Governor's conclusions. In this circumstance, if we try to support the Governor's decision by searching for deficiencies in Bascomb's plans, it appears likely that *we*—not the Governor—would be making findings, and they would be ones that we do not know that he would make.

Finally, we are at a loss to articulate how the Governor could reach the same conclusions based on Bascomb's prison record and his parole plans. It is not clear what further work or plans Bascomb could do as to these matters. Bascomb apparently had no drug or alcohol problems during 16 years of incarceration, and he participated in Alcoholics Anonymous and Narcotics Anonymous in prison as well as other rehabilitative programs that included those matters.[2] His release programs had testing, support, and education to deal with drugs and alcohol. His handwritten relapse prevention plan listed what "external" and "internal" factors he would avoid, and his wife stated she would be one of his sponsors. Moreover, Bascomb's personality disorders apparently did not interfere with his success during his incarceration; he completed several prison programs that included anger management and avoiding violence; and his prison work evaluations stated that he "is an exceptional lead man" and "[h]e is always doing well with his co-workers and he possesses admirable communication skills when interacting with staff." He researched the disorders the psychologist had diagnosed, he

---

[2] Bascomb's evaluation stated that he "attended meetings regularly and has enhanced the program through his participation." It stated that he was "a positive influence toward other inmates" and was "very effective" in relating his insights to them.

13

included ways to avoid problems from them in his plans, and he had located programs that included individual and group counseling. (See *In re Ryner* (2011) 196 Cal.App.4th 533, 551 [Governor's reliance on failure to take more anger management courses insufficient absent evidence that more courses were available or needed].)

For these reasons, we conclude the record lacks the "some evidence" required to support the Governor's conclusion that Bascomb was a current threat to public safety based on inadequate plans or efforts relating to his personality disorders and past substance and alcohol abuse.

## C. Remedy

"'[W]hen a court determines that a gubernatorial reversal of a parole decision is unsupported, the remedy is not an order for the inmate's immediate release; rather, the court vacates the Governor's reversal, reinstates the Board's grant of parole, and directs the Board to conduct its usual proceedings for a release on parole. This allows the Board to account for any recent developments reflecting on the inmate's suitability for parole, and to rescind its grant if appropriate.'" (*In re Sena* (2015) 236 Cal.App.4th 1270, 1274.) We do so here.

## III.  DISPOSITION

The habeas petition is granted.  The Governor's January 9, 2020, order reversing the Board's August 15, 2019, determination of Bascomb's suitability for parole is vacated, and the Board is ordered to conduct further proceedings in accord with this opinion.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL_____
                                                                                        J.

We concur:

RAMIREZ_____
                    P.J.

MENETREZ_____
                    J.

15