[No. S172903. July 29, 2010.]

In re MICHAEL B. PRATHER on Habeas Corpus.

[No. S173260. July 29, 2010.]

In re MIGUEL MOLINA on Habeas Corpus.

240

COUNSEL

Rich Pfeiffer, under appointment by the Supreme Court, for Petitioner Michael Prather.

Michael Satris, under appointment by the Supreme Court, for Petitioner Miguel Molina.

Munger, Tolles & Olson, Leo Goldbard; Cuauhtemoc Ortega; Alan L. Schlosser; Peter Eliasberg; and David Blair-Loy for ACLU of Northern California, ACLU of Southern California and ACLU of San Diego and Imperial Counties as Amici Curiae on behalf of Petitioner Miguel Molina.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Manuel M. Medeiros, State Solicitor General, Donald E. de Nicola, Deputy State Solicitor General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill, Heather Bushman, Anya M. Binsacca, Gregory J. Marcot and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent Warden Ben Curry.

OPINION

**GEORGE, C. J.**—We granted review in these two cases to determine the proper scope of an order directed to the Board of Parole Hearings (the Board) when a reviewing court concludes that a decision to deny parole by the Board is not supported by "some evidence" that a prisoner remains a current threat to public safety. After the completion of briefing, we consolidated these matters for purposes of oral argument and decision.

In *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*) and *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis*), we concluded that the standard governing judicial review of parole decisions made either by the Board or by the Governor is whether "some evidence" supports the determination that a prisoner remains currently dangerous. *Lawrence* and *Shaputis* each concerned the Governor's reversal of action taken by the Board, and we did not address the question of the remedy appropriate in the event the reviewing court determines the Board abused its discretion. Subsequent to our decisions in these two cases, however, a conflict emerged among the appellate courts as to

precisely what action a reviewing court may direct the Board to take after that court has granted the prisoner's petition for writ of habeas corpus. As set forth below, although some courts have ordered the Board simply to hold a new suitability hearing "in accordance with due process," other courts have directed the Board to find the prisoner suitable for parole unless *new* evidence—that is, evidence that has emerged subsequent to the parole-suitability hearing under review—supports a determination that the prisoner remains currently dangerous.

■ We conclude that a decision granting habeas corpus relief in these circumstances generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court, and should not place improper limitations on the type of evidence the Board is statutorily obligated to consider. Accordingly, we conclude that the appellate courts in the two cases now before us improperly restricted the Board's exercise of its discretion by directing that only certain evidence be considered at the parole suitability hearing of petitioner Michael B. Prather, and by ordering the release of petitioner Miguel Molina without further proceedings. Both appellate decisions errone-ously failed to recognize the Board's statutory obligation to consider the full record in making a parole-suitability determination.

## I.

We consider the limited procedural question of the proper scope of the decision of a reviewing court that concludes the Board has abused its discretion in denying a prisoner a parole date. Because we granted review to consider this limited issue only, the correctness of each of the appellate court decisions concluding that petitioners are suitable for parole is not before us, and the circumstances of the commitment offenses—and the import of those circumstances in deciding the question of suitability for parole—are not germane to our inquiry. Accordingly, we discuss the respective commitment offenses and postincarceration conduct of each petitioner in truncated form, and only as relevant to the procedural question before us.

### A. *In re Prather*

In 1982, Prather and two codefendants encountered the victims Elroy Ruiz and Randolph William Carrier in a park where the victims had driven to purchase marijuana.[1] Prather and his codefendants attempted unsuccessfully to take Ruiz's wallet. When Ruiz began to drive away, his car stalled. After

---

[1] This factual recitation is taken from the Court of Appeal's opinion, with modifications as appropriate. The statutory references that follow are to the Penal Code.

someone said, "shoot him, shoot him," Prather shot Ruiz. Prather and his codefendants then began beating Carrier, who was seated in the passenger seat. They pulled Carrier from the car and took his wallet. Carrier was able to free himself and fled in the automobile. Ruiz died from his gunshot wounds. Prather pleaded guilty to first degree murder (§ 187), robbery (§ 211), and attempted robbery (§§ 664, 211), and admitted an enhancement for personal use of a firearm (§§ 12022.5, 1203.06, subd. (a)(1)). The Los Angeles County Superior Court sentenced Prather to a term of imprisonment of 25 years to life, consecutive to a two-year determinate term on the enhancement.

Prather reached his minimum eligible parole date on October 20, 2000. He was found suitable for parole by a Board panel in 2005 and 2006, but both of these determinations were reversed by the Governor. On November 28, 2007, the Board found Prather unsuitable for parole and scheduled a new hearing to be conducted in one year.[2] The 2007 parole hearing is the subject of our present review.

Prather's prearrest record reflects that he struggled with substance abuse, was involved with gangs, and had a substantial criminal record, including convictions for carrying a concealed weapon, disorderly conduct while under the influence of drugs and alcohol, burglary, and assault with a deadly weapon. He was on probation at the time of the commitment offense. During his incarceration, Prather was cited for six serious rules violations, the most recent for possession of marijuana in 1994. He also has received 13 custodial counseling citations for minor misconduct—the most recent in 2002 for refusal to be housed in the general population. Prather has participated extensively in educational, self-help, and vocational programs.

At the 2007 parole hearing, Prather discussed the commitment offense and asserted that although he willingly joined his codefendants in robbing the victims, he was not the actual shooter. He admitted assaulting Carrier and taking his wallet after the shooting. He stated he pleaded guilty to first degree murder, and admitted being the shooter, because he had received threats from his codefendants. Prather told the Board, however, that even though he was not the shooter, he considered himself equally responsible for Ruiz's death because he participated in the offense.

The 2007 Board panel found Prather unsuitable for parole. Noting it was not bound by the findings of previous panels, the panel relied upon the

---

[2] Prather waived, for a period of one year, that subsequent parole hearing, which had been scheduled for January 29, 2009. After briefing was completed in this case, Prather informed this court that on March 24, 2010, at a regularly scheduled parole hearing, the Board considered all relevant information, concluded Prather was suitable for parole, and set a parole date. Our resolution of the issue involved in the present case does not encompass review of the further proceedings related to the March 24, 2010 hearing.

egregious nature of the commitment offense, emphasizing that multiple victims were attacked. The panel also considered a mental health evaluation prepared for Prather's 2005 hearing, as well as Prather's criminal history and disciplinary record. The panel expressed concern that the 2005 mental health evaluation was not completely supportive of release, despite rendering a "moderately low risk" assessment for future violence, and noted its preference for receiving a "low risk" assessment before it would find Prather suitable for parole. The panel requested a new mental health evaluation for the next parole hearing. Finally, the panel noted that the local prosecutor's office and the local police department opposed parole.

After unsuccessfully seeking habeas corpus relief in the superior court, Prather filed a habeas corpus petition in the Court of Appeal. After issuing an order to show cause, the appellate court in a split decision rendered an opinion granting Prather habeas corpus relief. The two justices in the majority concluded there was no evidence in the record to support the Board's finding of unsuitability, because the Board had found Prather suitable for parole in 2006 and there was no new evidence in the record suggesting that he is currently dangerous. The Court of Appeal, noting that the 2007 Board panel relied upon the 2005 mental health evaluation, which also had been considered by the 2006 panel, concluded that the 2007 panel's view of this evaluation "in a different fashion" did not provide "some evidence" of current dangerousness.

Notably, the Court of Appeal did not simply direct the Board to conduct a new hearing, but instead directed the Board "to find Mr. Prather suitable for parole unless, within 30 days of the finality of this decision, the Board holds a hearing and determines that new and different evidence of Mr. Prather's conduct in prison subsequent to his 2007 parole hearing supports a determination that he currently poses an unreasonable risk of danger to society if released on parole."[3]

## B. *In re Molina*

In 1984, petitioner Molina shot and killed the victim Ruben Morales.[4] The murder occurred on a farm in Arroyo Grande, where both men worked. The record reflects that the two men had had numerous altercations prior to the murder—including an incident in which the victim threatened Molina

---

[3] Justice Kriegler dissented, concluding that "some evidence" supported the panel's finding of current dangerousness, namely, the "moderately low risk" assessment in the 2005 mental health evaluation, the egregious nature of the commitment offense, Prather's criminal record, and his institutional misconduct.

[4] This factual recitation is taken from the Court of Appeal's opinion, with modifications as appropriate.

with a knife—and that Molina had purchased a rifle one week before the commitment offense. An eyewitness reported that Molina shot Morales as Morales watched television in a room at a bunkhouse. The pathologist later determined Morales had been shot between 15 and 18 times. The final two shots were fired at closer range—from a distance of less than two feet—than the previous shots. Molina fled after the shooting and was residing in Fresno when he was arrested four months later. Molina pleaded no contest to second degree murder. (§ 187.) The trial court sentenced Molina to 15 years to life on December 18, 1985.

Molina became eligible for parole on July 31, 1994. He was found suitable for parole by a Board panel in 2002, but the decision was reversed by the Governor. On December 20, 2006, the Board found Molina unsuitable for parole and issued a one-year denial. The 2006 parole hearing is at issue here.[5]

The record reflects that Molina was born in Mexico, had minimal formal schooling, and entered the United States illegally when he was 16 years of age. He was 23 years old at the time of the commitment offense. Molina abused alcohol and was intoxicated on the night of the commitment offense. He has no juvenile criminal record and no adult criminal record other than the commitment offense. During his incarceration, Molina has not received any serious rules-violation citations but has received five custodial counseling citations for minor misconduct, the most recent being in 1990. Molina has participated extensively in educational, self-help, and vocational programs.

At the 2006 parole hearing, Molina characterized the commitment offense as self-defense, stating that the victim and two other men had confronted him with a knife and had challenged him to fight. Molina explained that he was very fearful of Morales and ran into his room, grabbed his rifle, and then returned to the main room and shot Morales. Molina stated he had purchased the rifle for hunting, and not with the intent to kill or injure Morales.

The 2006 Board panel considered the brief 2005 mental health evaluation, which was an addendum to a 2004 evaluation. The 2005 evaluation, noting that the information in the 2004 evaluation was accurate, concluded Molina did not present a risk to society. The 2004 evaluation, which was more comprehensive, concluded that Molina demonstrated insight and empathy regarding the offense and that his potential for violence was no greater than that of the average person.

---

[5] At his subsequent parole hearing on September 23, 2008, Molina again received a one-year denial. At his next parole hearing, held on October 14, 2009, the Board found Molina suitable for parole. Our resolution of the present case does not encompass review of the further proceedings related to the October 14, 2009 hearing.

The 2006 panel found Molina unsuitable for parole, noting the egregious nature of the commitment offense and expressing concern about the discrepancy between Molina's characterization of the commitment offense as an act of self-defense, and the official record—which reflected that Molina attacked Morales without provocation. The panel requested an investigation into the circumstances of the crime—particularly whether Molina resided in the bunkhouse at the time of the shooting—and a new mental health evaluation to help clarify the factual discrepancies in the record.

Petitioner sought habeas corpus relief in the superior court. On May 30, 2008, after issuing an order to show cause and considering the return and the traverse that were filed, the court granted habeas corpus relief, concluding there was no evidence in the record to support the finding that Molina presented a current danger to society. Consequently, the court directed the Board to find Molina suitable for parole and to order his release.

In a split decision, the Court of Appeal affirmed the superior court's grant of habeas corpus relief. Determining that the 2006 panel's focus upon who actually resided at the bunkhouse was tangential to the ultimate issue of whether Molina presents a current danger to society, the majority concluded there was no evidence in the record to support a finding that Molina presents such a danger, in light of his consistently positive mental health evaluations and his extensive rehabilitation. Consequently, after noting that the Board initially set a parole date in 2002, and that "[a]ny further delay is unwarranted," the appellate court remanded the matter to the trial court with directions to "in turn remand to the Board with instructions to release Molina on parole in accordance with conditions set by the Board."

Justice Yegan dissented, concluding that "some evidence" supported the panel's finding of current dangerousness, because Molina's version of the events (that Morales and two friends arrived at the bunkhouse, a fight ensued between Morales and Molina, and Molina fatally shot Morales) conflicts with the official version of the events (that Molina entered the room where Morales was watching television and, unprovoked, shot him 15 to 18 times). The dissenting justice concluded that this discrepancy suggests Molina may lack insight into his commission of the offense. The dissent, disagreeing with the majority's remand order directing Molina's release on parole, also concluded the appropriate remedy would be to order the Board to hold a new hearing in accordance with this court's decisions in *Lawrence, supra*, 44 Cal.4th 1181 and *Shaputis, supra*, 44 Cal.4th 1241.

## II.

■ As we explained in our recent decision in *Lawrence, supra*, 44 Cal.4th 1181, the parole-suitability statutes "provide that the Board is the administrative agency within the executive branch that generally is authorized to grant parole and set release dates. (§§ 3040, 5075 et seq.) The Board's parole decisions are governed by section 3041 and title 15, section [2402] of the California Code of Regulations [citation]. Pursuant to statute, the Board 'shall normally set a parole release date' one year prior to the inmate's minimum eligible parole release date, and shall set the date 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public . . . .*' (§ 3041, subd. (a), italics added.) Subdivision (b) of section 3041 provides that a release date must be set 'unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.' " (*Lawrence, supra*, 44 Cal.4th at pp. 1201–1202, fn. & some italics omitted.)

■ Title 15, section 2402 of the California Code of Regulations sets forth the factors to be considered by the Board in implementing the statutory mandate.[6] This regulation is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. (Regs., § 2402, subd. (a).)[7] The regulation lists several circumstances relating to unsuitability for parole (such as the heinous, atrocious, or cruel nature of the crime, or an unstable social background)[8] and several circumstances relating

---

[6] All further references to Regulations are to title 15 of the California Code of Regulations.

[7] These factors include "the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Regs., § 2402, subd. (b).)

[8] Unsuitability factors are: (1) a commitment offense carried out in an "especially heinous, atrocious or cruel manner"; (2) a "[p]revious [r]ecord of [v]iolence"; (3) "a history of unstable or tumultuous relationships with others"; (4) "[s]adistic [s]exual [o]ffenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(1)–(6).) This subdivision further provides that "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subd. (c).)

Factors supporting a finding that the inmate committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured,

to suitability for parole (such as an inmate's rehabilitative efforts and demonstration of remorse, and the mitigating circumstances of the crime).[9] (Regs., § 2402, subds. (c), (d).) Finally, the regulation explains that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Regs., § 2402, subds. (c), (d).) The Governor's power to review a decision of the Board is set forth in article V, section 8, subdivision (b) of the California Constitution.[10]

---

or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Regs., § 2402, subd. (c)(1).)

[9] Suitability factors are: (1) the absence of a juvenile record; (2) "reasonably stable relationships with others"; (3) signs of remorse; (4) a crime committed "as the result of significant stress in [the prisoner's] life"; (5) battered-woman syndrome; (6) the lack of "any significant history of violent crime"; (7) "[t]he prisoner's present age reduces the probability of recidivism"; (8) "[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release"; and (9) the inmate's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)–(9).)

[10] Article V, section 8, subdivision (b) of the California Constitution provides in full: "No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

The statutory procedures governing the Governor's review of a parole decision are set forth in section 3041.2, which states: "(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

As we explained in *In re Rosenkrantz* (2002) 29 Cal.4th 616, 658–659 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*), "[b]efore the addition of article V, section 8(b), to the California Constitution in November 1988 by initiative (Proposition 89), the power to grant or deny parole was statutory and committed exclusively to the judgment and discretion of the Board. (*In re Fain* (1983) 145 Cal.App.3d 540, 548–550 [193 Cal.Rptr. 483].) The Governor had no direct role in decisions whether to grant or deny parole to an incarcerated individual. (*Ibid.*; cf. Pen. Code, §§ 3041.1 [authorizing the Governor to request that the full Board sitting in bank review a parole decision], 3062 [authorizing the Governor to revoke parole].) The constitutional authority of the Governor in this area was limited to the fundamentally distinct power to grant a reprieve, pardon, or commutation. (*In re Fain, supra,* 145 Cal.App.3d at p. 548; see Cal. Const., art. V., § 8, subd. (a).) By adding article V, section 8(b), to the California Constitution, the voters conferred upon the Governor constitutional authority to review the Board's decisions

■ "[T]he governing statute provides that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board must set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. [Citation.] Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra*, 29 Cal.4th 616, 654.)

■ In sum, the statutes and governing regulations establish that the decision to grant or deny parole is committed entirely to the judgment and discretion of the Board, with a constitutionally based veto power over the Board's decision vested in the Governor. Nevertheless, we held in *Rosenkrantz, supra*, 29 Cal.4th 616, that courts are authorized to review the merits of the Board's or the Governor's decision to grant or deny parole. We explained that both the Board and the Governor must consider the statutory factors concerning parole suitability set forth in section 3041 as well as the Board regulations (Regs., former § 2230 et seq.), and that "because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's [and the Board's] decision is subject to judicial review to ensure compliance with this constitutional mandate." (*Rosenkrantz, supra*, 29 Cal.4th at p. 664.) Thus, a petitioner is entitled to a constitutionally adequate and meaningful review of a parole decision, because an inmate's due process right "cannot exist in any practical sense without a remedy against its abrogation." (*Ibid.*; see also *Lawrence, supra*, 44 Cal.4th at p. 1213.)

■ In *Lawrence, supra*, 44 Cal.4th 1181, and *Shaputis, supra*, 44 Cal.4th 1241, we reaffirmed the availability of judicial review of decisions rendered by the Board or the Governor denying parole or reversing a grant of parole, and resolved a conflict among the appellate courts regarding the proper scope of the deferential "some evidence" standard of review we set forth in *Rosenkrantz, supra*, 29 Cal.4th 616, and thereafter applied in *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*). We clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence"

concerning the parole of individuals who have been convicted of murder and are serving indeterminate sentences for that offense."

supporting the Board's or the Governor's characterization of facts contained in the record. Specifically, we explained that, because the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a decision denying parole, the proper articulation of the standard of review is whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence, supra,* 44 Cal.4th at p. 1191.)

■ Our decisions in *Lawrence* and *Shaputis* addressed the Governor's reversal of a grant of parole by the Board, and did not determine the proper remedy when a reviewing court grants a petition for writ of habeas corpus on the basis that the Board's decision to deny parole was not supported by some evidence of current dangerousness. We previously have stated, however, that when a court determines that the Board has abused its discretion in denying parole, "the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.)

The phrase "in accordance with due process of law" is somewhat ambiguous and susceptible of various interpretations. Indeed, subsequent to our decisions in *Lawrence* and *Shaputis,* the appellate courts in making determinations that the Board abused its discretion in denying parole have fashioned a wide array of divergent remedies, engendering a conflict in the law with regard to the proper procedure for evaluating and resolving parole cases. (See, e.g., *In re Criscione* (2009) 173 Cal.App.4th 60, 78 [92 Cal.Rptr.3d 258] [the Board was ordered to hold a new hearing in which it may consider all relevant factors]; *In re Lazor* (2009) 172 Cal.App.4th 1185, 1204 [92 Cal.Rptr.3d 36] [same]; *In re Barker* (2007) 151 Cal.App.4th 346, 378 [59 Cal.Rptr.3d 746] [same]; but see *In re Masoner* (2009) 172 Cal.App.4th 1098 [91 Cal.Rptr.3d 689] [the Board was directed to find the inmate suitable unless new evidence of conduct or changed mental state demonstrated current dangerousness]; *In re Palermo* (2009) 171 Cal.App.4th 1096 [90 Cal.Rptr.3d 101] [same]; *In re Rico* (2009) 171 Cal.App.4th 659 [89 Cal.Rptr.3d 866] [the Board was directed to find the inmate suitable unless new and/or previously undiscovered evidence of the inmate's circumstances, conduct, and change in mental state demonstrated current dangerousness]; *In re Gaul* (2009) 170 Cal.App.4th 20 [87 Cal.Rptr.3d 736] (*Gaul*) [the Board was directed to find the inmate suitable unless new evidence of conduct demonstrated current dangerousness].)

As noted above, the Court of Appeal's decision in the Prather matter is similar to the decision in *Gaul, supra,* 170 Cal.App.4th 20, in directing the Board to find Prather suitable for parole unless new evidence of "conduct in prison" occurring subsequent to the 2007 parole hearing demonstrates current dangerousness. The Court of Appeal's decision in the Molina matter represents the most restrictive of the remedies fashioned by the various Courts of Appeal—directing that the prisoner be released immediately without further proceedings before the Board, and without review by the Governor.

## III.

■ The Attorney General contends that the appellate decisions rendered in both the Prather and Molina matters violate the constitutional doctrine of separation of powers (Cal. Const., art. III, § 3) by infringing upon the authority of the executive branch to make parole-suitability determinations. We hold that by purporting to limit the Board's consideration of all relevant statutory factors, the decisions in both cases do infringe upon this authority, and therefore are improper. We come to this conclusion because an order precluding the Board from considering all relevant and reliable evidence when making a parole-suitability determination improperly circumscribes the statutory mandate that the Board consider *all* relevant statutory factors when making its decision, and is incompatible with our directive in *Lawrence* that evidence of suitability and unsuitability must be considered in light of the full record before the Board. (*Lawrence, supra,* 44 Cal.4th at p. 1214; Regs., § 2402, subd. (b).)

Although, as noted above, we have not previously considered this precise issue, we observed in *Rosenkrantz, supra,* 29 Cal.4th 616, that a proper order after a grant of habeas corpus relief should direct the Board to "proceed in accordance with due process of law" (*id.* at p. 658), citing appellate decisions supporting this proposition. (*In re Ramirez* (2001) 94 Cal.App.4th 549, 572 [114 Cal.Rptr.2d 381], disapproved on another ground in *Dannenberg, supra,* 34 Cal.4th 1061; *In re Bowers* (1974) 40 Cal.App.3d 359, 362 [114 Cal.Rptr. 665].) These cases confirm our conclusion here that it is improper for a reviewing court to direct the Board to reach a particular result or to consider only a limited category of evidence in making a suitability determination.

■ In *Ramirez,* the appellate court upheld the trial court's grant of habeas corpus relief to the petitioner on the basis that the Board abused its discretion in finding him unsuitable for parole, but also noted that "the trial court erred by making its own evaluations of the evidence before the Board, and by ordering the Board to set a parole date. In deference to the Board's broad discretion over parole suitability decisions, courts should refrain from re-weighing the evidence, and should be reluctant to direct a particular result."

(*In re Ramirez, supra*, 94 Cal.App.4th at p. 572.) "The Board must be given every opportunity to lawfully exercise its discretion over [petitioner's] parole application." (*Ibid.*)

In *In re Bowers, supra*, 40 Cal.App.3d 359, the trial court granted the petition for a writ of habeas corpus on the basis that the petitioner had not been afforded a parole prerevocation hearing by the Adult Authority, the statutory predecessor of the Board. The sole issue before the appellate court was whether "the trial court went too far in ordering the Adult Authority to release petitioner from prison and restore him to parole and in barring the Adult Authority from further consideration of the alleged incident forming the basis for revocation of petitioner's parole." (*Id.* at p. 362.) The appellate court concluded that the trial court's order was improper. "The power to grant and revoke parole is vested in the Department of Corrections, not the courts. (Pen. Code, §§ 3040, 3056, 5054, 5077; *In re Schoengarth* [(1967)] 66 Cal.2d 295, 300, 304 [57 Cal.Rptr. 600, 425 P.2d 200].) The proper function of the courts in respect to parole and revocation of parole is simply to ensure that the prisoner is accorded due process. . . . Thus, where the Department of Corrections has failed to accord a prisoner due process of law in revoking his parole, the relief to which the prisoner is entitled on habeas corpus is not an order forever barring the Department of Corrections from proceeding further, but, rather, an order directing the Department of Corrections to vacate its order of revocation and thereafter to proceed in accordance with due process of law." (*In re Bowers, supra*, 40 Cal.App.3d at p. 362, citations omitted.)

██ The foundation for the decisions in *In re Ramirez* and *In re Bowers* is the doctrine of separation of powers. As explained recently by the court in *In re Lugo* (2008) 164 Cal.App.4th 1522 [80 Cal.Rptr.3d 521], in relying upon this doctrine to set aside a trial court's order remedying the Board's erroneous issuance of a multiyear denial under section 3041.5, subdivision (b)(2): "The separation of powers principle is embodied in the California Constitution, which provides as follows in article III, section 3: 'The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.' ' "The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. [Citations.]" [Citation.]' (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 662.) Although the doctrine is not intended to prohibit one branch from taking action that might affect those of another branch, the doctrine is violated when the actions of one branch 'defeat or materially impair the inherent functions of another branch. [Citation.]' (*Ibid.*) Intrusions by the judiciary into the executive branch's realm of parole matters may violate the separation of powers. (See *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095, 1099 [97 Cal.Rptr.2d 382] [court order

allowing inmate to question commissioners regarding their parole-related decision process violated separation of powers].)" (*In re Lugo, supra*, 164 Cal.App.4th at p. 1538.)

█ The orders in the present matters—purporting, in the case of Prather, to confine the Board's consideration of evidence solely to new evidence of Prather's "conduct in prison" since his last parole hearing and, in the case of Molina, to dispense entirely with any further evaluation by the Board or the Governor—materially infringe upon the Board's discretion to make parole decisions on the basis of all relevant information, and thereby improperly circumscribe the Board's statutory directive. "As we recognized in *Rosenkrantz, supra*, 29 Cal.4th 616, when evaluating whether an inmate continues to pose a threat to public safety, both the Board and the Governor must consider *all* relevant statutory factors, including those that relate to postconviction conduct and rehabilitation. (*Id.* at p. 655 [noting that the Board ' "cannot, consistently with its obligation, ignore postconviction factors unless directed to do so by the Legislature," ' and that ' "[a]lthough a prisoner is not entitled to have his term fixed at less than maximum or to receive parole, he is entitled to have his application for these benefits 'duly considered' " based upon an individualized consideration of all relevant factors'].)" (*Lawrence, supra*, 44 Cal.4th at p. 1219, italics omitted.)

█ Orders that are designed to limit the Board's consideration of evidence to only recent and specified changes in the existing record before the Board necessarily limit that body's consideration of *all* relevant factors, thereby improperly curtailing the Board's exercise of the authority it possesses under the governing statutes. Moreover, such restrictive orders also sanction the narrow type of evaluation by the Board that we specifically disapproved in *Lawrence, supra*, 44 Cal.4th 1181, 1214, in which we explained that "[b]ecause the parole decision represents a prospective view— essentially a prediction concerning the future—and reflects an uncertain conclusion, rarely (if ever) will the existence of a single isolated fact in the record, evaluated in a vacuum, suffice to support or refute that decision." Thus, the Board may not base its assessment of current dangerousness upon the existence or nonexistence of a suitability factor, but instead must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the full record. (*Id.* at p. 1221.) An order directing the Board to consider only the evidence that has materialized since the Board's last evaluation and, in some cases, requiring that only specified new evidence be considered, precludes the Board's consideration of the full record and thereby ensures that the new evidence will be "evaluated in a vacuum."

Turning to the appellate opinions rendered in the two cases under review, we conclude that the decision in the Prather matter impermissibly impairs the

Board's exercise of its inherent discretion to decide parole matters. The Court of Appeal directed the Board to find Prather suitable for parole unless new evidence of his conduct in prison since the last hearing supported a determination that he posed a threat to public safety if released. As the Attorney General points out, this limiting directive prevents the Board from considering Prather's 2008 mental health evaluation and new evidence that Prather waived his January 2009 parole hearing because he did not have documented parole plans—both matters that cannot be fairly characterized as relating to Prather's "conduct in prison." Yet, both of these circumstances are potentially probative concerning Prather's parole suitability, and both are factors that the governing statutes and regulations *require* the Board to consider.

Moreover, even if new evidence of Prather's conduct, mental state, or parole plans does not, standing alone, support a determination that Prather currently is dangerous, it certainly is conceivable that new evidence as to any of these factors might be probative when considered in light of other, existing evidence in the record. For example, if the record disclosed a recent disciplinary violation for reporting late to work, that information might not, standing alone, constitute some evidence that Prather remains dangerous, but it may possess substantially more probative value if the record demonstrates that Prather's criminality was tied to an inability to retain employment because of his chronic tardiness.

Indeed, it is possible that older evidence was not cited by the Board, and was not contained in the record before the reviewing court, because the parties determined such evidence was irrelevant. Yet, if new evidence emerges after the last suitability hearing, this older evidence may take on new relevance and may provide support for a determination that a prisoner is not suitable for parole. Under the restrictive order in the Prather matter, the Board would be barred from considering such evidence, thereby severely compromising the integrity of its decision.[11] These hypothetical possibilities are not exhaustive: they merely illustrate the myriad circumstances in which the evaluation of newly available evidence requires a reevaluation of existing evidence. Without question, consideration of the interrelationship and possible probative value of both new and existing evidence in the record lies squarely within the discretionary authority vested in the Board. A reviewing

---

[11] Even if we assume for the sake of argument that the reviewing court's order contemplates a consideration of any new evidence of petitioner's "conduct in prison" in the context of the full record, the court's directive still has a significant potential to create confusion, particularly as to whether certain new evidence properly may be characterized as relating to Prather's general conduct. In light of this potential confusion, a reviewing court should refrain from issuing directives that purport to limit the *type* of evidence that the Board may consider upon remand.

court may not—consistent with the principles embodied in the separation-of-powers doctrine—impair the exercise of this discretion by placing improper limits upon the Board's review of a prisoner's record.

 The even more restrictive order in the Molina matter—which purports to bar any further review by the Board and orders Molina's immediate release—is necessarily deficient for the same reasons. In view of our conclusion that a reviewing court may not improperly limit the evidence upon which the Board may rely in making a suitability determination, it follows that a court may not bar the Board from considering *any* evidence at all. Moreover, by ordering Molina's release prior to review by the Governor, the court's directive also improperly intrudes upon the Governor's independent constitutional authority to review the Board's parole decision. (Cal. Const., art. V, § 8, subd. (b); Pen. Code, § 3041.2; *In re Masoner, supra,* 172 Cal.App.4th at p. 1105.)[12] Thus, the appellate court's remand order violates the separation-of-powers doctrine. As in *Prather,* the matter should have been remanded without improper limitation to permit the executive branch to exercise its statutory and constitutional authority over parole decisions.

Petitioners assert that the restrictions imposed by the appellate courts in the matters presently before us are proper because the Board *already* has considered the entirety of the record and the Board's conclusion based upon that review has been determined by the Court of Appeal to be unsupported by "some evidence" of current dangerousness. Accordingly, petitioners contend that these restrictions are a proper means of ensuring that any subsequent decision by the Board comports with due process. Petitioners contend this is so because restrictions such as those at issue in the present cases properly will compel the Board to grant parole unless relevant information that has emerged since the Board's denial of parole contravenes the reviewing court's conclusion that the prisoner is suitable for parole.

 Of course, a court may, in appropriate circumstances, expressly state in its remand order that the Board may not base an unsuitability determination solely upon evidence already considered and rejected by the reviewing

---

[12] "Article V, section 8 of the California Constitution grants the Governor power to review board decisions 'with respect to the granting, denial, revocation, or suspension' of parole . . . . The Governor's power to review a parole decision begins only when the decision is effective, whether due to lapse of time, board approval, or court action." (*In re Tokhmanian* (2008) 168 Cal.App.4th 1270, 1276–1277 [86 Cal.Rptr.3d 250], italics omitted.) The Governor has the authority to weigh suitability factors differently from the Board: "Although 'the Governor's decision must be based upon the same factors that restrict the Board in rendering its parole decision' [citation], the Governor undertakes an independent, de novo review of the inmate's suitability for parole. [Citation.] Accordingly, the Governor has discretion to be 'more stringent or cautious' in determining whether a defendant poses an unreasonable risk to public safety." (*Shaputis, supra,* 44 Cal.4th at p. 1258.)

court. Such language is unnecessary, however, because the Board is required to adhere to the decision of the Court of Appeal irrespective of any specific limiting directions in the court's order. In conducting a suitability hearing after a court's grant of habeas corpus relief, the Board is bound by the court's findings and conclusions regarding the evidence in the record and, in particular, by the court's conclusion that no evidence in the record before the court supports the Board's determination that the prisoner is unsuitable for parole. Thus, an order generally directing the Board to proceed in accordance with due process of law does not entitle the Board to "disregard a judicial determination regarding the sufficiency of the evidence [of current dangerousness] and to simply repeat the same decision on the same record." (*In re Masoner, supra*, 172 Cal.App.4th at p. 1110.) Rather, a judicial order granting habeas corpus relief implicitly precludes the Board from again denying parole—unless some *additional* evidence (considered alone or in conjunction with other evidence in the record, and not already considered and rejected by the reviewing court) supports a determination that the prisoner remains currently dangerous.

In the majority of cases, such additional evidence will be new—that is, changes will have occurred in the prisoner's mental state, disciplinary record, or parole plans subsequent to the last parole hearing. As set forth above, however, it also is conceivable that new evidence will be probative only when viewed together with other evidence that already is part of the record (some of which may not have been contained in the record before the reviewing court), or that a review of the full record will reveal additional grounds supporting a decision to deny parole. A reviewing court should not compromise the Board's authority by engaging in speculation concerning the type of evidence that might change the calculus of the Board's parole decision. Instead, a proper judicial review and remand will ensure that the Board retains its full discretion to determine whether a new evaluation by that body is necessary and whether, in light of the court's findings, the inmate should be released. Accordingly, although a reviewing court may expressly limit the Board's reliance upon evidence the court already has considered and rejected as insufficient, the court should avoid issuing directives that improperly limit the Board's statutory authority to review and evaluate the *full* record—including evidence previously considered by the Board, as well as additional evidence not presented at prior parole hearings.

## IV.

The judgments rendered by the Court of Appeal are reversed, and these matters are remanded to the respective divisions of that court with directions,

in turn, to order the Board of Parole Hearings to conduct new parole-suitability hearings for Prather and Molina consistent with this opinion.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**MORENO, J.,** Concurring.—I concur in the majority opinion, but write separately to clarify certain language in the opinion that may be cause for confusion. The basic principles set forth in the opinion, when considered in the context of well-established principles of due process and administrative law, lead to the conclusion that after a court has reversed the parole denial decision of the Board of Parole Hearings (the Board), the Board may not deny parole based solely on arguments and evidence that have been presented, or reasonably could have been presented, at the prior parole hearing.

Although, as the majority explains, the Board retains some discretion on remand after a judicial reversal of its parole denial decision, that discretion is limited. It is indeed a well-established principle of administrative law that an administrative agency vested with discretion to make a certain decision in the first instance may have its discretion limited on remand or even eliminated entirely by a reviewing court. (See *Tripp v. Swoap* (1976) 17 Cal.3d 671, 677 [131 Cal.Rptr. 789, 552 P.2d 749] [no need to remand on the issue of awarding disability benefits where "there was no issue remaining on which the trial court could invade the director's discretion"], overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476]; *American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017 [56 Cal.Rptr.2d 109, 920 P.2d 1314]; *Ross Gen. Hosp., Inc. v. Lackner* (1978) 83 Cal.App.3d 346, 354 [147 Cal.Rptr. 801] ["Where the record of the administrative proceedings requires as a matter of law that a particular determination be made, the court may order that the agency carry out its legal obligation."].) Separation of powers principles dictate not only that administrative agency discretion be preserved according to the agency's statutory authorization, but also that courts must be able to play their assigned role of reviewing agency decisions and fashioning appropriate remedies when an agency has abused its discretion. If a court were unable to limit an agency's discretion on remand, if in effect the agency could on remand ignore the court's decision, then that type of disregard would upset the careful balance the separation of powers maintains no less than if a court were improperly to invade an administrative agency's discretion.

It is also important to note that separation of powers principles are already incorporated into the standard by which courts review the Board's parole decisions. Whereas in most cases, a court reviewing an administrative agency decision either exercises its own independent judgment or uses the more

deferential substantial evidence review (see *Bixby v. Pierno* (1971) 4 Cal.3d 130, 137 [93 Cal.Rptr. 234, 481 P.2d 242]), in the case of parole decisions, courts are to employ an even more deferential " 'some evidence' " test (*In re Lawrence* (2008) 44 Cal.4th 1181, 1191 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*)). This highly deferential standard reflects the considerable discretion with which the Board is vested. But once a final judicial decision has been rendered reversing the Board's decision under this deferential standard, separation of powers principles are not offended by acknowledging that this judicial decision significantly limits the Board's discretion to again deny parole.

The problem then, is not whether a court may limit the Board's discretion on remand, but rather how to define the nature and extent of that limitation. In *Lawrence, supra,* 44 Cal.4th 1181, we held that the Board and the Governor cannot deny parole to an eligible life prisoner serving an indeterminate term unless they find that the prisoner poses a current threat to public safety, and that courts will reverse a parole denial that is not based on at least some evidence of such a current threat. (*Id.* at p. 1191.) In the Michael B. Prather matter the Court of Appeal below, applying *Lawrence,* held that the Board had not produced some evidence of current dangerousness and reversed the Board's 2007 denial of parole. Under the basic principle of res judicata, that denial may not be relitigated. It is black letter law that "[r]es judicata bars the litigation not only of issues that were actually litigated in the prior proceeding, but also issues that could have been litigated in that proceeding." (*Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 82 [70 Cal.Rptr.3d 817], citing *Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 975 [104 Cal.Rptr. 42, 500 P.2d 1386].) Thus, given a final judicial determination that, as of 2007, there was no evidence that a prisoner poses a current threat to public safety, the Board on remand cannot base a finding of parole unsuitability *only* on evidence that was or could have been presented at the 2007 hearing, in effect relitigating that hearing.

Moreover, the present cases must be considered in light of the injunction in *In re Sturm* (1974) 11 Cal.3d 258, 272 [113 Cal.Rptr. 361, 521 P.2d 97] (*Sturm*), that due process requires the Board to provide a "definitive written statement of its reasons for denying parole." This requirement followed from the principle that a prisoner has the right to be " 'duly considered' " for parole and not to be denied parole arbitrarily, and that such rights "cannot exist in any practical sense unless there also exists a remedy against their abrogation." (*Id.* at p. 268.) A definitive written statement of reasons was necessary to guarantee that such an effective remedy exists, because, inter alia, it will help to ensure "an adequate basis for judicial review." (*Id.* at p. 272.) It is important that *Sturm* be taken at its words, and that the Board be required to issue a *definitive* written statement of reasons. The Board cannot, after having its parole denial decision reversed, continue to deny parole based

on matters that could have been but were not raised in the original hearing. Such piecemeal litigation would undermine the prisoner's right to a fair hearing and the ability of courts to judicially review and grant effective remedies for the wrongful denial of parole.

In short, the Board, like other litigants and other administrative agencies, is not entitled to the proverbial second bite at the apple. At the parole hearing it must state definitely its reasons for denying parole, i.e., all the arguments and evidence why the prisoner is currently dangerous. If the denial is challenged, the Board must defend its action based on those reasons. If the challenge is upheld, it may not again deny parole based on the same reasons, or based on arguments and evidence that reasonably could have been, but were not, raised at these prior proceedings.

Nothing in the majority opinion contravenes the above principles. The majority states that, in most cases, additional evidence on which the Board can legitimately rely to deny parole after remand by a court "will be new—that is, changes will have occurred in the prisoner's mental state, disciplinary record, or parole plans subsequent to the last parole hearing. As set forth above, however, it also is conceivable that new evidence will be probative only when viewed together with other evidence that already is part of the record (some of which may not have been contained in the record before the reviewing court), or that a review of the full record will reveal additional grounds supporting a decision to deny parole." (Maj. opn., *ante*, at p. 258.) I fully agree that any new evidence, such as "changes . . . in the prisoner's mental state, disciplinary record, or parole plans," is not required to be viewed in isolation, but in light of the record as a whole. Because there is often a considerable time lag between the parole denial under review and the judicial decision reversing that denial, the Board's mandate to protect the public must include an ability to consider significant new developments in the prisoner's situation during this interim period, and to determine whether those developments, considered in conjunction with all the available evidence, shed new light on the prisoner's current dangerousness. It is not completely clear what is meant by "or that a review of the full record will reveal additional grounds supporting a decision to deny parole." But I do not understand this conjunctive phrase to undermine in any way the principle established in *Sturm* that the Board has a duty to provide the prospective parolee, as well as the court, with a definitive statement of reasons for denying parole, nor to contravene the corollary principle that that the Board may not deny parole solely based on evidence that it reasonably could have produced at the previous parole hearing.

Two other points deserve mention. First, as the majority recounts, the Prather court's order directed the Board " 'to find Mr. Prather suitable for

parole unless, within 30 days of the finality of this decision, the Board holds a hearing and determines that new and different evidence of Mr. Prather's conduct in prison subsequent to his 2007 parole hearing supports a determination that he currently poses an unreasonable risk of danger to society if released on parole.' " (Maj. opn., *ante*, at p. 246.) Although the court's limitation on the type of new evidence that could be considered was overly restrictive, there was nothing improper about the court's requiring the Board to act in an expedited fashion. Such expedition is warranted, because the Court of Appeal judgment means that the Board has been unable to justify its denial of parole after a full judicial proceeding, and that in the interest of justice parole should be speedily granted unless the Board demonstrates that new developments require parole denial. Nothing in the majority opinion disallows the practice of ordering expedited parole hearings on remand.

Second, the majority opinion addresses the first remand after a parole denial. Should the Board on remand again deny parole, and the court again rule that the parole denial is unjustified, then a more drastic intervention, such as an outright order that the Board grant parole, may well be warranted. Of course even then, the Governor would still have the prerogative, pursuant to article V, section 8, subdivision (b) of the California Constitution, to review the decision. The extent to which courts' prior rulings would limit the Governor's authority is beyond the scope of the present opinion.